Argued December 19, 1911, decided January 2, 1912.

# HAWKINS v. DOE.

[119 Pac. 754.]

PROCESS—PUBLICATION SERVICE—SPECIFIC PERFORMANCE.

1. Under Section 399, L. O. L., authorizing service of summons by publication in suits concerning real property, and, under Section 414, providing that a decree requiring a conveyance shall be equivalent to such conveyance on noncompliance with the decree, service of summons may be had by publication in a suit to specifically perform a contract to convey.

SPECIFIC PERFORMANCE—CONTRACT TO CONVEY—PROOF REQUIRED.

2. Where a contract to convey sought to be specifically performed rests wholly in parol, and the claimed promisor is dead, clear and satisfactory proof of the terms of the agreement and strict performance by the promisee should be required.

SPECIFIC PERFORMANCE — CONTRACT TO CONVEY — EVIDENCE — SUFFICIENCY.

3. In a suit to specifically perform a claimed oral contract by decedent to convey, evidence held insufficient to show such agreement.

SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY—PROOF REQUIRED.

4. Where specific performance of an oral contract to convey land is sought on the ground of performance by the purchaser, the evidence of the terms of the contract should be clear and satisfactory.

SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY—EVIDENCE—SUFFICIENCY.

5. In a suit to specifically perform an oral contract to convey, evidence held insufficient to show that plaintiffs went into possession under the agreement.

SPECIFIC PERFORMANCE—RIGHT TO RELIEF—JUDICIAL DISCRETION.

6. Specific performance rests in the sound discretion of the court.

From Lane: LAWRENCE T. HARRIS, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is a suit by Delford S. Hawkins and Margaret C. Hawkins against John Doe, true name unknown, and who is the nephew and heir at law of A. J. Black, deceased, all known heirs of A. J. Black, deceased, and L. E. Ward, administrator of the estate of A. J. Black, deceased, to compel defendants to specifically perform an alleged oral contract to convey land. The complaint

alleges, in substance, that on September 25, 1907, plaintiffs entered into an oral contract with A. J. Black, defendants' intestate, whereby they agreed to furnish him board and clothing, and allow him to live with them as long as he should live, to care for him in his last sickness, and to stay by him until his death; that he was 75 years of age, had no relation, and that it was necessary for him to have some one care for him; that as a consideration of such services Black agreed to execute a deed to plaintiffs, which was to provide that they take and hold exclusive possession of the premises described in the complaint, and to have the proceeds therefrom as long as Black should live, and that at his death the whole interest should pass to plaintiffs, Black reserving a life interest in the premises for his own protection; that the premises were to be conveyed subject to the debts of Black; that plaintiffs fully performed their part of the agreement; that Black died on the 6th day of November, 1907; that he failed to execute the deed for the reason that he was stricken with paralysis, and thereafter, up to the time of his death, his condition was such that he was unable to do so; that L. E. Ward was appointed administrator of the estate, and in February, 1909, the county court made an order directing him to sell the property for the payment of debts, which amounted to about $600; that plaintiffs had been informed by deceased that he had a nephew living in California, whose true name is unknown, and he is therefore, designated by the name of "John Doe, nephew and heir at law of A. J. Black." Plaintiffs pray for a decree requiring that the covenant be specifically performed; that they be declared the owners of the premises; and that, if the property shall have been sold by the administrator before final decree, they be declared to be the owners of the residue of the money received from such sale, after the debts and expenses of administration shall have been paid. There was service by publication against

John Doe, who has not appeared; and personal service upon the administrator, who answered, denying the alleged agreement, and alleging that the premises had been · sold at the administrator's sale and conveyed by a sufficient deed to the purchaser. The sale and conveyance are admitted in the reply. Upon the trial the court held that after the sale, there being no specific performance possible as to the land, plaintiffs' demand became a mere money demand, not cognizable in a court of equity, and upon that ground refused to find upon the principal fact —the alleged contract—and dismissed the suit. Plaintiffs appeal.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. C. A. Wintermeier.*

For respondent there was a brief with oral arguments by *Mr. Lark Bilyeu, Mr. G. F. Skipworth* and *Mr. John M. Pipes.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. On behalf of defendants it is claimed that a suit for specific performance is purely in *personam,* and that the court acquired no jurisdiction by service of summons by publication. We cannot assent to this view of the law. Being to a great extent a federal question, the decisions of the federal courts furnish the safest guide in cases of this character. In *Boswell's Lessee* v. *Otis,* 9 How. 336, 348 (13 L. Ed. 164), Mr. Justice McLean says:

"It is immaterial whether the proceeding against the property may be by attachment or bill in chancery. It must be substantially a proceeding *in rem.* A bill for the ·specific execution of a contract to convey real estate is not strictly a proceeding *in rem* in ordinary cases; but where such a procedure is authorized by statute, or publication, without personal service of process, it is substantially of that character."

To the same effect are *Arndt* v. *Griggs,* 134 U. S. 316
(10 Sup. Ct. 557: 33 L. Ed. 918) ; *Adams* v. *Heckscher,*
(C. C.) 83 Fed. 281; *Single* v. *Scott* (C. C.) 55 Fed. 553.
For decisions of the State courts to the same effect, see
*Seculovich* v. *Morton,* 101 Cal. 673 (36 Pac. 387: 40 Am.
St. Rep. 106) ; *Robinson* v. *Kind,* 23 Nev. 330 (47 Pac. 1,
977) ; *Corson* v. *Shoemaker,* 55 Minn. 386 (57 N. W.
134) ; *Burrall* v. *Eames,* 5 Wis. 260.   In the latter case
the court says :

"A suit for specific performance, like that of foreclos-
ure, is of a twofold character, partly in *personam* and
partly *in rem.*  The court may enforce the contract, either
by operating upon the person to compel a conveyance
or may pass the title of the land by decree."

It must be conceded that there must be statutory
authority for such a proceeding, and such is the case
in this State.  By Section 399, L. O. L., service of sum-
mons by publication is authorized "when the subject of
the suit is real or personal property in this State, and
the defendant has or claims a lien or interest, actual or
contingent, therein, or the relief demanded consists wholly
or partly in excluding the defendant from any lien or
interest therein."   Section 414 provides that "a decree
requiring a party to make a conveyance, transfer, release,
acquittance, or other like act within a period therein
specified shall, if such party does not comply therewith,
be deemed and taken to be equivalent thereto."  These
sections bring this case within the reasoning of the decis-
ions heretofore cited.  A contract to purchase land would
be a hazardous proceeding, if the purchaser were required
to search the civilized world and sue each heir in the
place of his residence, in case of the vendor's death,
before performance, and we cannot concede that the law
requires such an absurd procedure.

2. Conceding, without deciding, that the adminis-
trator's sale was an equitable conversion of the property,

we are not satisfied that plaintiffs have made a case sufficient to justify a decree under the pleadings. Where the contract rests wholly in parol and the alleged promisor is dead, courts should demand clear and satisfactory proof of the terms of the agreement, and its strict performance by the promisee. Such cases furnish abundant opportunity for the perpetration of those frauds which it was the object of the statute to prevent by requiring the contract to be reduced to writing.

3. The evidence tends to show that deceased needed a home where he could have some one to care for him in his declining years, and that he had applied to several persons to look after him, saying that in return for such services he would give them the property at his death. One witness (Wiebke) testifies in substance:

"He said he had a small tract of land, and didn't have any house on it, and he wanted to know if I would not take the place and let him come and stay with us and live with us, if he would give us the place at his death, provided if we got along all right. * * So he furnished the lumber and built the house on his place, and, when he came and stayed with us something over a month, I asked him one day if he thought we could get along all right, and he said he was perfectly satisfied, and he said any time that we had time we would go to town and make out the papers. At his death I was to have the place, providing I took care of him in his last illness."

The "making out of the papers" was neglected, and finally this witness, by consent of Black, sold out his rights to one Stevens, who succeeded him in caring for deceased. Stevens testifies, in substance, that Black said he was willing to deal with him upon the same terms as he had promised Wiebke.

"I was to get the place, and I was to take care of Mr. Black, and at his death the place was to be mine. * * He said, if he got sick or anything, * * he would send to town and have his lawyer come out and make out the papers."

This witness stayed about a year and three months, and Black, although frequently requested, neglected to make out any writings, and the witness finally gave up the contract and moved away. He gives this reason for so doing:

"I have got a place down below there on the river just the same as Mr. Wiebke, and I got tired running backwards and forwards, and considered that the best proposition was to go down on the other place, and I didn't have the papers for the other, and I didn't want to run any risk at all, so I thought I would take the other proposition, which I knew was a safe one."

In relation to the Hawkins contract, William Forrester testifies that Black said to him:

"He had a home at last; * * that he was going to give Mr. Hawkins the papers just as soon as he got settled down. * * As soon as they got things straightened around, he would make out the papers, and they should have the place as long as he lived; that is, they could have the place after he was dead, as long as they took care of him while he was living."

Later Black told Wiebke that he had the same agreement with Hawkins that he had had previously with him. Williams, who is a son of Mrs. Hawkins, testified that Black applied to him to take care of him, and said that if he would do so, he would "make out the papers" that day, but would keep a life lease; that he declined, but recommended to Black Mr. and Mrs. Hawkins; and that Black afterwards told him that he was perfectly satisfied with them. The proposal, as Hawkins states it, is as follows: Black said: .

"If you will take care of me properly during my life, and see that I am properly buried, I shall turn that property over to you. It shall be yours. But, before we do that, I would like to know that I would be treated right or not, and I would like to stop with you and see if we get along all right or not for a couple of weeks. If we get along all right, we will make the bargain and agreement. If we don't, I will pay you what you are out, and that will end it."

That he came the next Sunday and stayed all night, and the next day said it was all right, "and that he was willing and ready to make a bargain with us to take care of him. This was on September 30, 1907." After staying with plaintiffs for two weeks, they all moved to Black's place, and he said to plaintiffs:

"Now, this is yours. All I want is just to be taken care of."

Hawkins further testified:

"He said he would make out writings that would be satisfactory to both parties, turning the property over to me; that he would want a life interest in it; that he would want to be sure that he wouldn't be beat out of a living while he did live. He simply wanted a life interest in the property, and, when he was dead, it was mine. 'It is yours,' he says, meaning me and my wife."

Mrs. Hawkins' testimony is substantially the same as that of her husband. She testifies that, when they moved out to Black's place, he said:

"This is yours. Everything here is yours. You don't need to consult me about nothing. All I want is care as long as I live and I feel that I will get it. * * We took perfect possession of the place."

In answer to a question, on cross-examination, Mr. Hawkins testified:

"He said when we got out there and were settled we would come back to town and make out the writings."
Q. "He wanted to protect himself?"
A. "Yes; he said he would make out the deed."

The foregoing is practically the substance of the testimony as to the agreement, except that Mrs. Hawkins testifies that upon his deathbed she asked him if he was satisfied with his treatment, and he answered, "Yes." It will be noticed that the last answer above quoted is the only instance in which the word "deed" is used, and that seems rather a deduction of the witness as to the

effect of the conversation than an attempt to repeat Black's exact language. In the answer just preceding it, in narrating the same conversation, he gives it thus:

"He said * * we would come back to town and make out the writings."

And it is a significant fact that in all his conversations, as related in the testimony, he never used the word "deed." The witnesses all agree that he said "make out the writings," "make out the papers," "make out the agreement." We think the testimony does not indicate that he ever intended to make any conveyance which would tend to deprive him of the title or possession of his property during his lifetime. His intention was evidently to protect himself and hold the whip hand, so as to secure proper treatment, and if, when he felt death approaching, he thought he had received this, to make a will, bequeathing his property to plaintiffs. This is shown by the testimony of Wiebke, with whom he made an identical agreement, and by the testimony of Stevens, who succeeded Wiebke; the latter witness saying:

"I was to get the place and I was to take care of Mr. Black and at his death the place was to be mine."
Q. "Was this to be in writing?"
A. "Well, he said, if he got sick or anything, * * he would send to town and have his lawyer come out and make out the papers."

It is evident that the arrangement was to be tentative, until he could see the very end. The plaintiffs testify that, after his two weeks residence with them in Eugene, he expressed himself perfectly satisfied, and ready to make the agreement. But, if this were true, why did he not then, when he was near a lawyer and notary, make the conveyance? Why delay until they had moved out to his farm, and thus necessitate a useless trip to Eugene? He may have been satisfied with the treatment he had

received up to that time, but it remained for him yet to be satisfied that it would continue to the time of his death. In the tragedy of King Lear the great dramatist portrays the foolishness of an old man who in his lifetime strips himself of his possessions, and depends on the gratitude of his children for support in his declining years. The reports are full of such tragedies, wherein undutiful children, finding themselves possessed of a parent's means of support, forget the obligation of filial love and gratitude, and either drive the aged donor from them or make his life miserable with them. To the discredit of human nature, such instances are as frequent as the reverse; and, if this be so with children of the donor, how much more likely it is to be the case where the transaction is with strangers. Black was wise enough to wish to protect himself, and we do not think the evidence shows that he ever promised or intended to make a deed, but that he probably did intend, if at the close of his life the plaintiffs had not relaxed their efforts to make him comfortable, to remember them by a will, and perhaps to leave them all his property; but this is not the case which the plaintiffs have presented by their pleadings.

4. Where specific performance of an oral contract to convey land is sought to be enforced, on the ground of performance by the vendee, the evidence of the terms of the contract should be clear and satisfactory. 36 Cyc. 689. At common law, and in many of the states by statute, plaintiffs would not have been permitted, after the death of the alleged promisor, to testify as to the terms of the contract, and, while the rule has been relaxed in this State, there are many reasons why the testimony of interested parties under such circumstances should be closely scrutinized. It is so easy for self-interest to sway even the honest mind, so that it will give a different meaning to the language used, or construe rather than repeat actual conversations, that disinter-

ested testimony is highly desirable, nay, almost indispensable, in cases of this kind. Our statute requires the judge presiding at jury trials to instruct them that evidence of the oral admission of a party should be viewed with caution (Section 868, L. O. L.), and, if this is the rule as to admissions of parties living and able to explain their language and meaning, with how much greater force should it apply when the evidence is directed to the alleged declarations of one whose lips are sealed in death, and to establish a contract which the law requires to be in writing.

5. The evidence of plaintiffs' possession is not clear or satisfactory. It is true that Hawkins says he went into possession and his wife says that they took "perfect possession of the premises," but the evidence indicates that their possession was that of tenants, until a final agreement should be consummated, rather than that of persons holding as purchasers. They admit that Black said that he wanted to retain a life estate for his own protection, but this would be a poor protection if plaintiffs had the possession and enjoyment. The reasonable inference which we draw from the statements of these interested witnesses is that Black intended to keep the property in his own hands so that he would be in a position to expel plaintiffs from it, in case they did not care for him in a satisfactory manner; that he expected them to use and keep the products of the farm without paying for them, except in the way of services to himself; that he intended to part with his right of possession seems almost incredible. To conclude, we think plaintiffs have not made a showing sufficient to justify us in decreeing a specific performance of this alleged contract.

6. Specific performance can never be demanded as an absolute right, but rests in the sound discretion of the court to be granted or denied as the interests of justice may seem to require. 36 Cyc. 548, and cases there cited.

In the case at bar we think it in the interest of justice to leave the plaintiffs to pursue their remedy at law, which is certainly adequate to compensate them for any services they may have rendered or damages they may have suffered in the premises.

The decree of the circuit court is affirmed.

AFFIRMED.