Argued April 26; affirmed July 10, 1934

THORNE *v.* EDWARDS ET AL.

(34 P. (2d) 640)

*E. O. Potter* and *Edward F. Bailey,* both of Eugene, for appellant.

*H. E. Slattery,* of Eugene (Slattery & Slattery, of Eugene, on the brief), for respondents.

ROSSMAN, J.   The complaint alleges that July 17, 1930, R. L. Edwards and Idell Edwards, husband and wife, owned the real property with which this suit is concerned; that on that day they, as vendors, and the plaintiff, as vendee, executed a contract whereby the plaintiff agreed to purchase the property at a price of $5,000; that the contract provided that the price should be paid in thirteen installments, twelve of $60

each (including 7 per cent interest), payable monthly, and the thirteenth to be the entire balance of the purchase price; that the contract also required the plaintiff to pay assessment liens which had been imposed upon the property amounting to $127. Further, the complaint alleges that simultaneously with the execution of the contract a deed, signed by the Edwards, was placed in escrow, accompanied with written instructions to the escrow agent to deliver it to the plaintiff when she had paid the above sums of money. The instructions contain the following language: "Time being of the essence hereof." The complaint alleges that after paying nineteen $60 installments (including the initial payment of $60) the plaintiff, in March of 1932, requested the Edwards for an extension of time for payment of the balance of the purchase price, and that thereupon "The plaintiff and the said grantors entered into a supplemental written agreement for the sale and purchase of said premises and that a copy of the same is hereto attached and marked Exhibit A." Exhibit A was executed February 1, 1932; fixes the purchase price of the property at the sum of $4,384.21, which is the original purchase price, less the amount of the nineteen installments of $60 after interest has been deducted from them; provides that the aforemention sum of $4,384.21 shall be paid as follows: "The second party will pay the sum of $60 per month upon both principal and interest for the period of one year beginning March 1, 1932, the interest being included in the $60 each month, and that all of the balance of the purchase price shall be fully paid on or before March 1, 1933. The said party of the second part agrees to pay all paving of any kind and all assessments which were against the same property on September 1, 1930, and also agrees to pay all taxes upon said real estate which have become due and payable since September

1, 1930 * * *. It is further agreed that failure to pay any installments when due or within thirty days thereafter shall work a complete forfeiture of this contract and the same shall terminate as to both parties without legal process; and that the party of the second part shall lose all rights to anything that she shall have paid upon the purchase price; and that she will surrender the immediate possession of said real estate to the parties of the first part." According to the complaint, a copy of this new agreement was deposited with the escrow agent and the instructions which were delivered to him concerning the first contract were continued in effect as applicable to the new one. Next, the complaint alleges "that concurrently with the execution of said written agreement the plaintiff and R. L. Edwards and the defendant Idell Edwards, his wife, entered into an independent oral collateral agreement wherein and whereby it was agreed by and between said parties and the plaintiff that if on the first day of March, 1933, the plaintiff had not paid the full purchase price under said contract but had made her regular monthly payments thereon to said time, that the time for paying the balance then remaining due on said contract would be continued for an additional year, provided that during said extended term the plaintiff made regular monthly payments on said contract of $60 per month, and that at the end of said year under similar circumstances and upon the same conditions, said escrow would be extended for an additional year, at the end of which time the balance then remaining due on said purchase price would be due in full; and that the said verbal contract was a part of the consideration for the execution of the second contract". The language just quoted is followed with averments which state that, relying upon the oral agreement and the omission of the Edwards to insist

upon payment of the full balance of the purchase price when the twelve payments had been made and their acceptance of the next six monthly installments, the plaintiff signed the second agreement. The complaint alleges that after the execution of the second agreement R. L. Edwards died; that no legal representative for his estate was appointed; that prior to his death he and his wife executed a deed describing this property in which the grantees are the two sons of R. L. Edwards; that the deed was not delivered during the lifetime of R. L. Edwards; that pursuant to a plan devised by R. L. Edwards, his widow, Idell Edwards, threatens to now deliver the deed to the two sons; that beginning with the month of March, 1932, the plaintiff made her regular monthly payments on the second written agreement; that she has not paid the February, 1933, installment, and "that plaintiff has failed to pay the 1931 taxes". These allegations are accompanied with an averment that the plaintiff omitted payment of the monthly installments and of the delinquent taxes "for the reason that she has been unable to secure from the defendants or any of them any agreement as to further extension of time for the payment of the balance now remaining due on said contract which said balance now is the sum of $4,021.40". The complaint avers that "a financial depression" exists which renders it impossible for the plaintiff "to pay the full balance of $4,021.40 on the first day of March, 1933," to sell the property or to secure a loan upon it so as to enable her to pay the balance of the purchase price. She also alleges that since she signed the original contract she has paid upon the purchase price $979.60; that she has placed improvements upon the property of the value of $1,000 and paid the 1930 taxes amounting to $180.36, "and that the plaintiff now has a substantial equity in said premises". The complaint next

alleges that the plaintiff "is occupying the same as a home and using the same as a boarding and rooming house and is making her living from said premises". It avers that she is able to maintain the $60 a month installments, to discharge the taxes, and tenders these sums to the defendants "when the defendants confirm, ratify and carry into effect the oral agreement above referred to". The prayer seeks (1) a decree restraining Idell Edwards from delivering to the other two defendants the aforementioned deed executed by herself and R. L. Edwards; (2) that the defendants be restrained "from ousting or attempting to oust the plaintiff from the premises above described without proceeding with a foreclosure of plaintiff's interest in said contract"; (3) that the alleged oral agreement for an extension of the time of payment "be established, ratified and confirmed"; and (4) equitable relief protecting the plaintiff from the loss of her equity in the premises. A supplemental complaint filed August 10, 1933, avers that after the institution of this suit and after the death of R. L. Edwards the aforementioned deed executed by him and Idell Edwards was delivered to Horace and Paul Edwards; that after the service of summons upon the three defendants the two sons instituted an action of ejectment against the plaintiff for the possession of the real property mentioned in this suit; that after the filing of the complaint the legislative assembly of this state adopted House Joint Resolution No. 18 (see 1933 Session Laws, page 910); that after the institution of this suit the federal congress enacted the legislative act known as the Home Owners Loan Act of 1933; that later the plaintiff requested the defendants to cooperate with her to secure a mortgage loan from the Home Owners Loan Corporation; that they refused to do so; that since the commencement of this suit the first half of the 1932

taxes upon the property have become due; "that the plaintiff has not paid the same for the reasons set forth in her complaint"; "that the monthly payments becoming due under said contract since the filing of this suit have not been paid by the plaintiff for the reasons set forth in the said complaint"; that the financial depression continues "and the plaintiff's rents and profits from operating a boarding and rooming house in the premises described in said complaint have decreased and that the plaintiff is not now able to pay in full at this time all of the first half of said taxes and all the payments which have accrued under said contract since the filing of this suit"; that the plaintiff "is willing and ready to comply with any order which the court may make herein in reference to the balance remaining due on said contract and taxes and assessments against said property in so far as it is humanly possible for her to do so, in view of the existing economic conditions and of her personal financial situation". This pleading closes with a prayer asking (1) that the court inquire into the equities involved in this suit in accordance with the spirit of House Joint Resolution No. 18 "and attempt an amicable adjustment of plaintiff's default"; (2) that the deed from R. L. Edwards and Idell Edwards to the defendants Horace and Paul Edwards be held invalid; (3) that the ejectment action be dismissed and the defendants be restrained from instituting similar actions during the pendency of this suit; (4) that the defendants be required to accept for the balance of the purchase price of the property securities issued by the Home Owners Loan Corporation; and (5) that if the court should determine that it has no power to compel the defendants to accept such securities, the court inquire into the ability of the plaintiff to make payments upon the purchase price and enter a decree fix-

ing the amount of the monthly payments of principal and taxes which the plaintiff should pay. The answer admits that R. L. Edwards died intestate April 17, 1932; that the plaintiff paid nineteen installments of $60 each; that March 4, 1932, the new contract, a copy of which is attached to the complaint as Exhibit A, was executed as a substitute for the original one; that the plaintiff failed to discharge the payment which became due on February 1, 1933, and the succeeding ones; that she paid the 1931 taxes amounting to $180.36; that it is difficult to sell real property and obtain mortgage loans; that the contract known to the complaint as Exhibit A was assigned by R. L. and Idell Edwards to Horace and Paul Edwards; and that on March 7, 1932, the Edwards executed and delivered a deed conveying the property to the two sons. All other averments of the complaint are denied. The answer to the supplemental complaint admits that the defendants Horace and Paul Edwards have instituted the ejectment action; that the 1933 legislative assembly enacted Joint Resolution No. 18; that the federal congress enacted the Home Owners Loan Act of 1933; that the defendants have refused to accept in satisfaction of the balance of the purchase price bonds issued by the Home Owners Loan Corporation; that the plaintiff made no further payments since instituting this suit. All other averments of the supplemental complaint are denied.

Findings of fact of the circuit court, which we believe are supported by competent, substantial evidence, state: "Prior to the death of the said R. L. Edwards, he and his wife, Idell Edwards, made, executed and delivered a deed to the defendants Horace L. Edwards and Paul Edwards, conveying to them the real estate herein described and the said contract was assigned

to them and they are the owners of the said real estate.''

The evidence shows that the land in controversy consists of a lot, improved with a house three stories high, containing sixteen rooms, divided into apartments, housekeeping rooms and other quarters. For the year ending September 1, 1931, the plaintiff derived an income of $1,173.38 from the property, the next year her income was $896.71, and the third year, $664.89. In addition, the plaintiff and her sister occupied quarters in the structure as their home. As will be observed by referring to the complaint, the plaintiff admits that she has paid upon the purchase price only $979.60. Although testimony indicates that the plaintiff improved the property at an expenditure of $1,000, she failed to pay the cost of making the improvements. One of the defendants testified that under normal circumstances the property would be worth $10,000. The evidence indicates that the unpaid taxes and street assessments mentioned in the pleadings remain unpaid and that the plaintiff has paid nothing upon her contract since January, 1933. Thus, at the time of the trial the $60 installment due on February, 1933, was unpaid and the balance of the purchase price due March 1, 1933, was likewise unpaid. The uncontradicted testimony indicates that the monthly rental value of this property is $60. The plaintiff did not testify, the explanation being that she was too ill to attend the trial. Her sister, Mrs. F. R. Hunt, who testified that she was thoroughly familiar with the execution of the contracts and all matters which have since transpired, testified that it was impossible for the plaintiff to discharge the overdue $60 payments, and also pay the delinquent taxes. We come now to the contention that the evidence shows that a collateral agreement was effected whereby the Edwards bound

themselves to execute a new agreement extending the time to pay the balance which became due March 1, 1933, when it developed that the plaintiff was unable to pay it in a lump sum at that time. The only witness for the plaintiff who gave testimony upon this subject was the aforementioned Mrs. Hunt. She testified that she asked R. L. Edwards, in February or March of 1932, for a new contract extending the time of payment. As a result of her request the new contract, dated February 1, 1932, was promptly drafted and executed. The statements made by Edwards while this was being done are the foundation of the plaintiff's contention that the alleged collateral agreement was effected. The following quoted from Mrs. Hunt's testimony are the only words in the record upon which plaintiff depends:

"* * * In the conversation he said he thought it was only right and fair inasmuch as I had done as much as I had for repairs on the house and it was in so much better condition than it was when we went there, in consideration of that fact, he said he thought it was only fair and right that when I asked him—he spoke about the date. It was then, I think sometime in March, and I believe we had been without a contract since September, and he said, 'When shall we date it? Shall we date it from now or date it back to September?' And I said, 'If you date it from now, it only gives us a six month's contract, if you want it to run for a year,' and I said, 'You might as well date it from now,' because at the end of this time, in accordance with what we had said that afternoon about the repairs there and all that, I said, 'If I ask you for another contract, you will give it to me and give us another and then give us another.' And I said, 'By that time the amount will be down where we can get the money from anybody and pay up your balance.' And he said, 'In consideration of these facts,' that he had spoken of, and the repairs that had been made and the condition it was in, he said he might just as well have

the interest, and it would be much better for all concerned to have it in monthly payments than it would to have the whole amount; that it would be much better for all concerned to do that. So I said, 'Well, now, let's you and I fix this up; we can go in sometime next week.' He set the next time he come in to make this contract. I said, 'Let's you and I fix this up today.' I have neuralgia terribly. And he said that he was in an awful hurry. It was raining, and I think somebody was waiting for him, and he said, 'The next time I come in town we will fix that up.' He said, 'Your word I know is good and I think you think mine is,' and he said, 'Don't you worry one about that house; I will see that you have a square deal on this house.' I said 'All right; that's all I ask, is a square deal.' He said, 'You have given us more than a square deal and I will surely see that you get one.' I said, 'All right.' He was going out then. I think the next Tuesday or Wednesday sometime he came to ask about going up and said that he was ready for my sister to take up to sign this contract, and I went along and I said to him, 'How about that other matter?' He said, he had a bad night the night before. Wasn't feeling very well, but he said, 'I will be in pretty soon and we will fix that up.' That's the last time I ever saw him. Then when he died—''

Later, upon cross-examination, she was asked, ''Why didn't you say to Mr. Edwards, 'That isn't our agreement. We will put all our agreement in this writing'?'' to which she replied, ''He said if I would sign this contract for the year that was all that he had talked with them about, and then he would come in and fix up this other one.''

The testimony of Mrs. Hunt clearly reveals that she never again saw Edwards after the second contract was signed. She admitted that she read and understood the instrument before signing it. She does not claim that any of these defendants waived any pro-

vision of the contract; to the contrary, it appears that they consistently insisted that the plaintiff must strictly perform them. It appears that they pursued this course so as to avoid the troubles which they claim attended the plaintiff's efforts to perform under the first contract.

The above-quoted testimony, except that which was adduced upon cross-examination, was taken over the ruling of the trial judge who held it inadmissible.

Section 9-212, Oregon Code 1930, provides that unless the validity of the instrument is in dispute, or the party whom it is sought to charge by its terms claims that it contains a mistake or imperfection, the court shall receive no evidence of the agreement "other than the contents of the writing" itself.

It will be observed that Edwards' words, upon which the plaintiff relies, were spoken at the time negotiations were in progress for the new contract. Nothing whatever was said after that instrument was signed. The plaintiff contends that Edwards' words constitute an independent collateral agreement for a renewal of the second contract in the event of plaintiff's default in making payment of the unpaid balance March 1, 1933. It is clear that the parol evidence rule renders inadmissible evidence which seeks to modify a contract by parol. But it does not affect a parol collateral contract independent of a written agreement. As is pointed out in *Sund & Co. v. Flagg & Standifer Co.*, 86 Or. 289 (168 P. 300), the oral agreement will not be deemed collateral if it contradicts provisions of the written one. It must concern a subject distinct from that to which the written contract applies. A test to determine whether the oral agreement is collateral, indicated in that decision, is to ascertain whether, in view of the circumstances of the parties, the subject matter and the na-

ture of the writing, it would have been natural for the contracting parties to have embodied it in their writing had they intended to make it a part of their contractual obligations. See also the annotation, 70 A. L. R. 752. An examination of the written instrument shows what appears to be a full and complete agreement setting forth in detail the obligations of the contracting parties. A reading of the instrument induces a belief that the reciprocal obligations of the parties had been determined in detail and were then reduced to writing by the draftsman of their contract. The instrument not only delineates the amount of the different installment payments and the time when they must be paid but also states the result which shall occur in the event of a default continuing for thirty days or more; that is, the contractual rights of the parties shall automatically terminate. It will be observed that if the alleged oral agreement is given effect, the written provisions for an automatic termination of the contractual rights will be deleted from the instrument and the oral agreement requiring the vendor to subscribe to a new contract, extending the time of payment, will be substituted for the stricken words.

This is not the first time that such a proposition has been placed before the courts for decision. We quote from section 644, Williston on Contracts:

"A parol agreement that an instrument need not be paid, or need not be paid in a certain contingency, or may be paid wholly or partly in merchandise or shall not be sued on when due, or shall be renewed, is in violation of the parol evidence rule."

From Daniel on Negotiable Instruments (7th Ed.), section 175, we quote:

"An agreement to renew a bill or note would be binding, but unless it otherwise expressed the number of times of renewal, it would be construed as an agree-

ment to renew only once. If contemporaneous with the execution of the instrument, such agreement would not be binding unless in writing, for the reason that it would contradict the terms of a written contract, and parol evidence for that purpose is inadmissible.''

See also Page on Contracts, section 2194.

In the following decisions oral evidence that an agreement for a renewal was effected at the time when the defendant signed the promissory note was held inadmissible because of the parol evidence rule: *Stiles v. Vandewater,* 48 N. J. Law 67 (4 Atl. 658); *Homewood People's Bank v. Heckert,* 207 Pa. 231 (56 Atl. 431); *New London Credit Syndicate Limited v. Neale,* 2 L. R. Q. B. 487; *Heare v. Graham,* 3 Camp. 57. These decisions are especially persuasive because it is less likely that a promissory note would embody a provision for a renewal than a lengthy instrument of the character before us. None of the instruments before the courts in those decisions, like the one before us, made express provision for the result that should occur in the event of a default. We have found no decision which held admissible evidence of a contemporaneous oral renewal agreement. See, however, Wigmore on Evidence (2d Ed.), section 2444. Both reason and the precedents convince us that the excluded evidence was inadmissible.

■ But if it may be assumed that the evidence was admissible, we fail to find in it any support for the alleged collateral agreement.

■■ Next, the plaintiff argues that the defendants violated some duty to her (which she fails to define) when they refused to cooperate with her efforts to secure a loan from the Home Owners Loan Corporation created under the Home Owners Loan Act of 1933

(see chapter 64, 73d Congress, first session). This act does not require a mortgagee to accept the bonds issued by the Home Owners Loan Corporation but renders acceptance optional. Moreover, as was said in *The Home v. Selling,* 91 Or. 428 (179 P. 261, 21 A. L. R. 403):

"The plaintiff cannot be compelled to accept the land in satisfaction of its claim, any more than it could be required to accept municipal bonds or a band of cattle."

Next, the plaintiff argues that any decree which declines to grant to her the relief sought by her prayer ignores House Joint Resolution No. 18 of the 1933 legislative assembly (see 1933 Session Laws, page 910) from which we quote the following:

"Resolved, that it should be and hereby is recommended to courts of equity wherein foreclosures are sought that the maxim that a plaintiff seeking the aid of equity should be required to do equity be strictly regarded, and that during the present emergency the court should require evidence to be produced in all such mortgage or conditional contract of sale foreclosure suits before entering a decree of foreclosure, and if from such evidence so produced, it is apparent to the court that there has been an honest though unavailing effort to meet the terms of the mortgage or conditional contract of sale, the court should give due consideration to the facts and attempt an amicable adjustment of the default between the parties, and if unable to accomplish that purpose then the court, within the time allowed by law, should render a decree consonant with the equities of the case before it."

It will be recalled that the uncontradicted testimony indicates that the reasonable rental value of the property of which the plaintiff has had possession since July 17, 1930, is $60 per month. The trial having been conducted September 13, 1933, the plaintiff had had

possession of the property for approximately thirty-eight months, or the equivalent of a rental value of $2,880. In the period from September 1, 1930, she collected from the property $2,734.98, and, in addition, used it as a home for herself and her sister. During the course of her occupancy she paid upon the contracts a total of $1,860. In the meantime, she has neglected the taxes and city assessments. Thus, it appears that the plaintiff has no equity in the property whatever, she having received more than she has paid. These circumstances do not indicate that the decree of the circuit court which dismissed her suit did any violence to the spirit of the legislative resolution to which she refers.

■ It will be observed from the provisions of the contract previously quoted that the parties stipulated the result which should occur in the event of plaintiff's failure to discharge her payments. Our decisions have frequently given effect to such stipulated remedies: *Kemmerer v. Title & Trust Co.,* 90 Or. 137 (175 P. 865); *Mitchell v. Hughes,* 80 Or. 574 (157 P. 965); *T. B. Potter Realty Co. v. Breitling,* 79 Or. 293 (155 P. 179); *Potter Realty Co. v. Derby,* 75 Or. 563 (147 P. 548).

The decree of the circuit court in dismissing the suit and holding that the plaintiff has no interest in the property described in her complaint did nothing more than give effect to the remedy which the parties agreed should be available to the vendor upon the contingency which has developed. In so ordering, the circuit court did not deprive the plaintiff of any right.

The above disposes of every contention presented by the plaintiff. It follows that the decree of the circuit court is affirmed.

RAND, C. J., and BEAN and BELT, JJ., concur.