Argued October 13, affirmed December 13, 1961

BARCHUS ET AL *v.* PIONEER TRUST
COMPANY ET AL

366 P. 2d 890

*R. W. PicKell,* Salem, argued the cause and filed a
brief for appellants.

*T. W. Churchill,* Salem, argued the cause for respondents. With him on the brief were Harold Eichsteadt, Woodburn, Donald D. McKown, Hillsboro, Ralph Skopil, Salem, Ferris F. Boothe and Black, Kendall & Tremaine, Portland, George Van Natta, St. Helens, and Erlandson & Rook, Milwaukie.

Before WARNER, Presiding Justice, and SLOAN, O'CONNELL, LUSK and BRAND, Justices.

WARNER, J.

This is an appeal by the plaintiffs Barchus from a decree in a suit for specific performance of an alleged oral contract by Albena Lanius, deceased, to devise real property to the plaintiff Jerry Barchus in consideration of personal services to be performed by plaintiff Arthetta Barchus, his mother, for said decedent. The defendant Pioneer Trust Company is executor of the Lanius estate and the other defendants are beneficiaries under her will.

Arthetta Barchus and Albena Lanius were sisters. They owned and lived on adjoining farms in Marion county inherited by each through their father, Alexander Moisan, in 1938. After Mr. Moisan's death the sisters went into possession of their respective inherited parcels. Prior thereto Arthetta and her husband rented a portion of Mr. Moisan's land and during that period Albena lived with them.

Plaintiffs contend that sometime in 1938 the two sisters entered into an agreement whereby in return for services, care, company, comfort and assistance by Arthetta, Albena agreed to execute a will, devising her farm to Jerry Barchus, her nephew. Jerry was then about eight years old. Mrs. Lanius died testate on April 20, 1959. Mrs. Barchus claims complete per-

formance on her part, but alleges that the will executed by Albena on January 27, 1958, was not in accordance with their agreement. It did, however, contain a provision establishing a $5,000 trust for the benefit of Jerry, payable to him at the rate of $100 per month.

The questions presented by the appellants are: (1) whether the evidence is sufficient to support the alleged agreement; (2) if we find such an agreement, whether the evidence of Arthetta's performance is referable to the contract; and (3) whether the decedent's declarations and conduct estop her representative from asserting facts contrary thereto. But we find that the appeal can be disposed of by answer to the first question, viz., did Mrs. Lanius make the contract as alleged?

■ The law relating to oral contracts to devise real property has been the subject of numerous decisions of this court and is well settled. We have recognized that such transactions furnish abundant opportunity for the perpetration of fraud and are regarded with suspicion. They are, therefore, subjected to the closest scrutiny by the courts. *Hunter v. Allen,* 174 Or 261, 278, 147 P2d 213, 148 P2d 936.

■ When such a contract is wholly in parol, it must be established by clear, concise, convincing and satisfactory evidence. It also must be just, reasonable and mutual in its terms. *Clark v. Portland Trust Bank,* 221 Or 339, 349, 351 P2d 51 (1960), and cases there cited; *Hunter v. Allen,* supra. Although it is competent for one to contract with another to devise his real property to him, such a contract is within the statute of frauds, and thus is unenforceable and void unless sufficiently performed so as to take it out of the statute. ORS 41.580; *Clark v. Portland Trust Bank,* supra, at 355; *LeVee v. LeVee,* 93 Or 370, 376-7, 181 P 351. There must be a strict performance by the promisee of

the contract's terms and conditions. *Hunter v. Allen,* supra; *Losey v. O'Hair,* 160 Or 63, 73, 83 P2d 493.

We now turn to inquire whether the alleged contract has been established by clear and convincing evidence.

The decedent is not here to give her version of the transaction. However, we have the provisions of her last will and testament, as well as two other wills which were introduced by plaintiffs. They are inconsistent with the promise attributed to her by the appellants. The last will of Mrs. Lanius was dated January 27, 1958. The will signed by decedent on June 17, 1947, specifically left to Jerry any automobiles owned by her at the time of her death. Plaintiffs' second exhibit was a carbon copy of a rough draft, dated February 11, 1953. In this draft Jerry was named as the recipient of a piano, any automobiles and $10,000 in trust. In all three of these documents the farm, along with the rest of her undisposed estate, went to the residuary legatees.

Mrs. Barchus claimed that the decedent made four wills, the fourth one purportedly having been made sometime in 1940. Although neither Mrs. Barchus nor, evidently, any other living person ever saw this will, reference to this "fourth will" by Mrs. Barchus is offered to support the contention of the plaintiffs that the decedent told her sister Arthetta she had willed her farm to Jerry in conformance with her earlier oral promise.

Although the alleged contract was entered into in 1938, when Jerry was eight years old, the decedent did not die until 21 years thereafter. At no time prior to her death did she suggest to Jerry that he would inherit the farm. Neither did Mrs. Barchus ever discuss the alleged agreement with Jerry, her attorney,

or anyone else until after the decedent had been dead for at least a number of weeks.

Jerry testified that he was in constant contact with his aunt during her lifetime, but the only thing he could recall that she ever said concerning her intent to leave something to him when she died was that she wanted him to have her automobile. Jerry further stated that although he and his mother were both present when the will was read and had visited their own lawyer's office four or five days later for advice concerning the competency of Mrs. Lanius to make a will, yet nothing was mentioned on either occasion concerning the alleged contract. In fact, Jerry said that the first he heard of his deceased aunt's alleged promise was during a later meeting at the same attorney's office. Mrs. Barchus admitted the first time she mentioned the alleged contract to anyone was at least three weeks after she first became cognizant of the contents of her sister's will.

The decedent's own conduct tends to negative the contention of the plaintiffs. Aside from Mrs. Barchus, not one of the 18 witnesses called by the opposing parties testified that the decedent had ever said anything indicating that she was either obligated by an agreement to leave any real property to Jerry or that she had ever made such a provision in any will.

We find no evidence, other than the testimony of Mrs. Barchus, which bears upon the existence of a contract to devise the property to Jerry, as distinguished from evidence tending to show a purely gratuitous intent on the part of Mrs. Lanius to make him some testamentary gift. Various witnesses testified that the decedent made statements to them such as: "I am passing mine on down to Jerry;" "she was going to leave him [Jerry] the property;" "going to

give it to Jerry;" and "my property would be turned over to him [Jerry]." Although one witness did testify that the decedent had mentioned having left the farm to Jerry, when asked later if she recalled the exact statement of the decedent, this witness replied: "She said the farm would go to Jerry." Not one of the witnesses who gave this testimony stated that Mrs. Lanius ever suggested that she was doing so because of a contractual obligation. Her reasons varied: sometimes it was because of a desire to keep the land in the Moisan family which had occupied it ever since it was homesteaded by her grandfather many years before. At other times she stated her proposed gift to Jerry was because he was her favorite nephew.

We conclude that these occasional statements credited to the decedent were at most mere expressions of an intention to do something in the future. This view finds support in our previous decisions wherein we have held similar statements wanting in probative value when attempting to prove alleged oral agreements to devise. In *Hawkins v. Toombs,* 194 Or 478, 487-88, 242 P2d 194, the plaintiff relied on similar recitals in support of a contract to devise real property. We there held that expressions found in a letter from decedent to plaintiff, such as "the home will be Mayme's when I am gone," and "then if something should happen to Ma or me, this property be yours anyway," did not sufficiently indicate an alleged agreement to devise. The effect of statements of the foregoing character was therein summarized:

"* * * It is no more than a gratuitous promise of the kind so frequently made by persons closely related or intimately attached to the promisee in terms of respect and esteem. If we would elevate such isolated statements from their status of spontaneous compliments to the dignity of bind-

ing and enforceable covenants, we would open flood gates of litigation which would involve the estate of almost every decedent. We conclude that the letter has no probative value in support of plaintiff's cause." (194 Or at 488)

See, also, *Losey v. O'Hair,* supra (160 Or at 75), where a decedent's assertions of like purport were held not to be referable to any contract between him and the plaintiff therein.

Mrs. Barchus testified that she and her husband were the only other parties present when the alleged agreement was made with Mrs. Lanius. Plaintiffs, however, never called Mr. Barchus to testify concerning the alleged agreement. Although Mrs. Barchus testified that her husband was an invalid, we find no explanation as to why his testimony was not adduced by a deposition if his condition prevented his presence in court.

The record as a whole fails to disclose any evidence corroborating the testimony of Mrs. Barchus to the effect that decedent had promised to give the property to Jerry in return for services performed or to be performed by Mrs. Barchus. Here, we are asked to depend upon Mrs. Barchus' best memory of the alleged agreement after a lapse of 21 years. A like situation where an agreement to devise was attempted to be proven solely by the uncorroborated testimony of the plaintiffs is found in *Hawkins v. Doe,* 60 Or 437, 119 P 754. There, Mr. Justice McBride pertinently observed:

"* * * It is so easy for self-interest to sway even the honest mind, so that it will give a different meaning to the language used, or construe rather than repeat actual conversations, that disinterested testimony is highly desirable, nay, almost indis-

pensable, in cases of this kind. Our statute requires the judge presiding at jury trials to instruct them that evidence of the oral admission of a party should be viewed with caution (Section 868 L.O.L.), and, if this is the rule as to admissions of parties living and able to explain their language and meaning, with how much greater force should it apply when the evidence is directed to the alleged declarations of one whose lips are sealed in death, and to establish a contract which the law requires to be in writing." (60 Or at 445)

See, also, *Herr v. McAllister,* 92 Or 581, 587, 181 P 741; *Hunter v. Allen,* supra (174 Or 261).

In the *Hunter* case we find at p 281 a further persuasive reason for requiring more than the testimony of the claimant:

"* * * If equity should act to compel the specific performance of an alleged contract to devise real property, proved unequivocally only by the testimony of the claimant, the statute of frauds might as well be abrogated. * * *" See, also, *Tiggelbeck v. Russell,* 187 Or 554, 568-69, 213 P2d 156.

Even if we were to concede that an oral contract existed and that the above-enumerated services constituted adequate consideration for the promise to devise, the record is devoid of any attempt by the plaintiffs to show that the services were of such "exceptional character or of such a peculiar value to the promisee that the value thereof is not subject to pecuniary estimate." *Hunter v. Allen,* supra, at 278; *Losey v. O'Hair,* supra, at 73.

■ It would serve no useful purpose to further analyze and review the 320 pages of testimony and the 15 exhibits. All have been carefully examined. Suffice

to say that the testimony as a whole has failed to show by clear, satisfactory and convincing evidence the terms and conditions or performance by plaintiffs of the alleged contract, or, in fact, that there was such a contract. Furthermore, the agreement, if made, did not require plaintiffs to change their position or mode of living. The Barchus family was never obligated to forego any benefit or suffer any detriment in order to perform the occasional services they rendered the decedent.

Mrs. Barchus' silence for more than 20 years concerning the contract, the want of knowledge of its existence upon the part of her son, Jerry, until sometime after his aunt's death; his mother's tardiness in bringing the agreement to the attention of her attorney, and then not until after exploring the possibility of challenging the validity of the will on the ground of the testatrix' alleged incompetency, combine to persuade us that the claim of an agreement to devise the farm to Jerry was an afterthought which did not come into being until the demise of Mrs. Lanius.

We, therefore, come to the same conclusion reached by the learned trial judge who heard the cause and find appellants failed to sustain their claim that Albena Lanius agreed to devise her realty to her nephew Jerry Barchus.

The decree of the circuit court is, therefore, affirmed.