Argued May 7, affirmed September 6, 1962

# BARNSTABLE *v.* UNITED STATES NATIONAL BANK ET AL

374 P. 2d 386

*David C. Silven,* Baker, argued the cause for appellant. On the briefs were Banta, Silven, Horton & Young, Baker.

*W. L. Jackson,* Baker, argued the cause for respondents. On the brief were Jackson & Johnson and Austin Dunn, Baker.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

WARNER, J.

In this suit plaintiff seeks a declaratory judgment determining that she is a pretermitted child of the testator, James Witherspoon, or, in the alternative, for a decree for the specific performance of an alleged oral contract for plaintiff's benefit made by and between the decedent and his wife, plaintiff's mother. From an adverse decree, plaintiff appeals.

In 1937, when Joan was about four and one-half years old, her mother married James Witherspoon. She thereafter resided with her mother and stepfather as a member of the family. In 1947 she was adopted by decedent and continued to reside with her parents until 1949 when she was married. The Witherspoons were divorced in 1950.

Mr. Witherspoon died in March, 1960, leaving a will dated June 3, 1953. The third paragraph read:

"To my foster daughter, Joan I leave the sum of $1.00."

This was followed by a residuary clause leaving his entire estate to seven brothers and sisters in equal shares. These are the same persons named as defendants.

We first give attention to plaintiff's assignment of error arising from the holding of the court that plaintiff was named in Mr. Witherspoon's will and, therefore, is not a pretermitted heir as she claims.

She argues that the will provides for a "foster daughter, Joan," whoever that may be, but there is no provision for her as his "adopted" daughter.

ORS 114.250 provides:

"If any person makes his will and dies, leaving a child   *   *   *   not named or provided for in

such will, * * * every such testator, so far as regards such child * * *, not provided for, shall be deemed to die intestate; * * *."

■ The object of the pretermission statute is to protect children from omission by oversight and not to require that an actual provision be made for them, nor that the children be designated by name. *Gerrish v. Gerrish,* 8 Or 351, 354 (1888).

Plaintiff represents that Mr. Witherspoon's will contains no intimation that plaintiff was his daughter and does not name her; and that it would be conjecture and speculation to hold that plaintiff was named in the will. As indicated by *Gerrish v. Gerrish,* supra, a child does not have to be designated by name, yet here someone by the name "Joan" is designated who is described as "my foster daughter." We know from a reading of the will that the testator had a "daughter" named Joan and from the further provisions of the third paragraph that it was the testator's intent to disinherit that daughter by leaving her the nominal sum of one dollar. If the daughter Joan was one of foster status, and no more, then there was no need for the third paragraph in the will because the children receiving the consideration provided by ORS 114.250, supra, are only those born to or adopted by a testator.

The descriptive phrase "my foster daughter" creates at most a latent ambiguity when we know as we do that the testator had an adopted daughter by the name of Joan. 95 CJS 920, Wills § 636; 57 Am Jur 681, Wills § 1050.

"* * * But it is not necessary that the beneficiary correspond in all respects to the description, it being held sufficient if he corresponds thereto in enough particulars to make it reasonably certain

that he was intended and no other person exists who corresponds sufficiently to the description to raise a doubt as to the identity of the beneficiary. * * *" Thompson, Wills (3d ed), 412, § 262.

■ When a beneficiary is designated in a will both by name and description, as here, and there is a conflict between the name and the descriptive matter so that they do not accurately apply to the same person there is a latent ambiguity removable by extrinsic evidence. *In re Devitt's Will,* 172 NYS2d 848, 850; *In re Sussman's Will,* 60 NYS2d 609, 610; *In re Nolan's Estate,* 56 Ariz 353, 108 P2d 385, 387; *Schnack's Estate v. Schnack,* 155 Kan 681, 130 P2d 591, 596; *In re Nessel's Estate,* 164 Cal App2d 798, 331 P2d 205, 209; *Bristol v. Mazza,* 288 SW2d 564, 566 (Tex Civ App 1956); 95 CJS, supra, at 942, § 646; 4 Page, Wills (Bowe-Parker Rev 1961), 252, § 32.6. See, also, *Jones v. Dove,* 7 Or 467, 471 (1879); *Putnam v. Jenkins,* 204 Or 691, 705, 285 P2d 532; and Annotation, "Admissibility of extrinsic evidence to aid interpretation of a will," 94 ALR 26 at 96, 104 (1935).

■ When the testator describes a relationship he knows did not exist, as Mr. Witherspoon had to know, but identifies the object of his bounty by name, he will be deemed to have made his benefaction with a knowledge of the nonexistence of the relationship described. *In re Chambers' Estate,* 112 Misc 551, 183 NYS 526 (wherein the testator described twin foster children as his adopted children); *In re Nolan's Estate,* supra (108 P2d at 387); *Schnack's Estate v. Schnack,* supra (130 P2d at 596); 95 CJS, supra, at 942.

■ The plaintiff objects to the admission of evidence aliunde on the ground it goes to the testator's intent. Testator's intent must, of course, be gathered from the four corners of the will and without the aid of

extrinsic evidence. But here, as we have indicated, the intent is clear; that is, the testator's determination to disinherit a daughter by the name of Joan. The permissible extrinsic evidence under the circumstances of this case goes only to clarify the identity of the party referred to as his daughter and, therefore, in a sense supplements and fortifies that intent. The courts allow a considerable latitude in the admission of testimony to accomplish that purpose. 4 Page, Wills (Lifetime ed), 643, § 1622.

We do not hold that the phrases "adopted daughter" and "foster daughter" are synonymous, but we recognize that they refer to relationships that have an important element in common which sometimes leads to an interchangeable use not justified where exactness should prevail. Neither an adopted child nor a foster child are born to the family where they receive parental care and solicitude. In short, neither are children of the blood. The distinctive difference in the terms when properly employed is that the adopted child, by reason of statutory adoption procedures, acquires the same rights of inheritance as does a child born to the parents of the adoption, whereas, the foster child does not obtain inheritable rights in the estates of foster parents under the laws of descent and distribution.

Had the testator more aptly described Joan as "my adopted daughter" or as "my daughter," this phase of the litigation would have been avoided.

■ The admitted evidence clearly demonstrates to us that the "Joan" named in the will was the plaintiff, Joan Barnstable. No children were born to the marriage between the testator and Joan's mother. Plaintiff testified that Mr. Witherspoon had no children other than herself. Her mother's testimony is in the

same vein. At the trial, counsel for plaintiff confessed their inability to produce evidence of any person by the name of Joan who was associated with the testator.

We dismiss the question of pretermission as being devoid of merit.

■ We now turn to a consideration of plaintiff's alternative prayer for specific performance of a contract to make a will. Various aspects of this phase of the appeal are comprehended in plaintiff's last three assignments of error and will be reviewed together.

We find plaintiff making a two-pronged claim of agreement to give her an interest in her stepfather's estate. The first has its origin in the adoption proceeding. The second is a by-product of the Witherspoon divorce and is more particularly derived from the negotiation of the parties in that matter for the property settlement which the Witherspoons executed on November 14, 1950. All testimony concerning the formulation of both alleged agreements comes solely from plaintiff's mother, the former Mrs. Witherspoon.

Plaintiff in her complaint alleges that in consideration of the adoption proceeding in 1947, Mr. Witherspoon "orally agreed with the plaintiff and with the plaintiff's mother * * * that he, the said James Witherspoon would make no effort to disinherit the plaintiff." This rests upon a most tenuous showing; so tenuous, in fact, that it gives no support to the claim.

Plaintiff's mother places the situs for the adoption agreement in the office of Mr. Dunn, then acting as attorney for the Witherspoons in the adoption matter. When asked to state the conversation upon which plaintiff now relies, her mother answered: "Well, in part, Mr. Dunn, warned him [Mr. Witherspoon] of his responsibilities. * * * and he also admonished Jim

[the decedent] that he could not disinherit Joan." And that constitutes the total testimony relative to the alleged adoption agreement. It is patent the evidence does not remotely suggest that Mr. Witherspoon was at that time a party to any form of agreement concerning his testamentary intentions toward Joan and no inference that he so obligated himself can be derived therefrom.

More interesting is the evidence of the promise which Joan's mother claims Mr. Witherspoon made to her at the time the Witherspoons were negotiating a property settlement for their impending divorce.

We first take note that for about seven years prior to the divorce the Witherspoons had been equal partners in the conduct of a business known as the Antlers Hotel, in Baker, Oregon. The partnership had accumulated certain valuable assets, consisting of the Antlers Hotel building and furnishings, an adjacent property, known as the Rogers Hotel building, and other miscellaneous items of personal property. The property settlement agreement, dated November 14, 1950, effected a dissolution of the partnership and a division of all property owned by both parties. Under it Mr. Witherspoon acquired his wife's interest by payment of $30,000 and the proceeds from the sale of the home place in the amount of $16,316.68. Mr. Witherspoon also assumed all outstanding liabilities of the partnership. Both executed their several obligations under the agreement. On the day following the execution of the settlement agreement, Mrs. Witherspoon verified the divorce complaint. A decree of divorce was entered on December 4, 1950. It also gave approval to the agreement of the parties dated November 14, 1950.

The negotiations for the property settlement, con-

cluded on November 14, 1950, had been begun by the Witherspoons sometime in October. Mrs. Witherspoon testified that the agreement by Mr. Witherspoon to leave Joan his entire estate was made orally in the bus station on the premises of the Antlers Hotel. No one else was present. The exact time of this meeting is not supplied, but it may be assumed that if such a promise was made that it was shortly prior to November 14. She stated that she then expressed dissatisfaction with the offer of $30,000 for her part of the partnership business as being an inadequate division and that he replied: "I will make a will leaving everything I have to Joan." There is no evidence that either party conveyed this information to their respective attorneys charged with putting the agreement in the form which they finally executed.

The trial judge in his carefully-considered opinion held that the oral agreement, if made, was not a collateral to the integrated contract. He also held that the parol-evidence rule (ORS 41.740) precluded receipt of such evidence on the ground that it would tend to vary the express provisions of the agreement signed by the parties on November 14, 1950, and even if parol evidence was admissible, it was not convincing. We concur in all of those conclusions.

■ If the oral agreement was in fact collateral, then the application of the parol-evidence rule may be avoided. In *Hyland v. Oregon Agricultural Co.*, 111 Or 212, 217, 225 P 728, this court, speaking by Mr. Justice RAND, observed:

"It is a substantive rule of law that as between the original parties to a contract and their privies, in the absence of fraud, mistake in fact or illegality in the subject matter of the contract, where the parties have entered into a contract which is com-

plete in itself and which has been reduced to writing, it is 'conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing'; and that parol evidence, that is, evidence extrinsic to the writing itself, is inadmissible for the purpose of adding to, subtracting from, altering, varying or contradicting the terms of the written contract or to control its legal operation or effect, and that all oral negotiations or stipulations between the parties preceding or accompanying the execution of the written contract are regarded as merged in it: * * *."

See, also, *Dorsey v. Tisby*, 192 Or 163, 176, 234 P2d 557; *Willamette Prod. Credit Ass'n v. Day*, 167 Or 451, 458, 118 P2d 1058; *Marks v. Twohy Bros. Co.*, 98 Or 514, 529, 194 P 675.

*Thorne v. Edwards*, 147 Or 443, 454-455, 34 P2d 640, furnishes a test for determining whether the oral agreement was collateral. We there said:

"* * * [the parol-evidence rule] does not affect a parol collateral contract independent of a written agreement. ['Citation] * * * the oral agreement will not be deemed collateral if it contradicts provisions of the written one. It must concern a subject distinct from that to which the written contract applies. A test to determine whether the oral agreement is collateral * * * is to ascertain whether, in view of the circumstances of the parties, the subject matter and the nature of the writing, it would have been natural for the contracting parties to have embodied it in their writing had they intended to make it a part of their contractual obligations. * * *"

If plaintiff's witness is to be believed as to the scope of Mr. Witherspoon's promise made during the course of their discussion in the Antlers Hotel, then

it was made to assuage the then Mrs. Witherspoon's concern that $30,000 was not a fair value for her interest in the partnership and was accepted by her as further consideration to equalize the value to which she believed herself entitled. If true, it became an important part of the consideration for the agreement which covered matters other than a division of the partnership assets. On Mr. Witherspoon's part, he relinquished a valuable right, if he did in fact agree to limit his right of testamentary disposition by making Joan his sole heir. *Holman's Will,* 42 Or 345, 356, 70 P 908; *Streight v. Streight,* 226 Or 386, 387, 360 P2d 304.

■ Applying the test for a parol collateral contract, as set out in *Thorne v. Edwards,* supra (147 Or at 454-455), it would seem that it would have been natural for the contracting parties to have embodied the oral agreement in their writing had they intended to make it a part of their contractual obligation. The words of Mr. Witherspoon, upon which plaintiff relies, were spoken at a time when the negotiations between the parties were in progress and each was represented by competent counsel. The document which was finally executed is carefully drawn, reflecting a high degree of professional consideration for the rights and interests of both parties. Mr. Witherspoon's alleged agreement to leave all of his property to Joan even at the time made had the promise of great value to Mrs. Witherspoon's daughter, a prospect confirmed by the inventory and appraisement of the Witherspoon estate, which is an exhibit in this case. If plaintiff's mother was actually receiving less than the amount she was entitled to in the division of the partnership assets, why did she not have her attorney, who was the scrivener, include a provision that she settled for this

amount in further consideration of decedent's promise to make plaintiff his sole heir? It would have been a simple matter and easy to accomplish.

Plaintiff's mother was no novice in matters of business. Prior to her marriage to Mr. Witherspoon, she had conducted a business of her own in Kemmer, Wyoming. After their marriage, they operated a hotel together in that place before removing to Baker. Moreover, on September 7, 1949, during the period of their separation preceding the divorce, they entered into an agreement confirming the partnership, providing for its management by Mr. Witherspoon and directing certain monthly payments be made to Mrs. Witherspoon. Mr. Witherspoon's failure to observe all the obligations on his part to be performed under that agreement was one of the reasons leading to its abrogation and the formulation of the new contract of November 14, 1950. With the prior and recent experience with Mr. Witherspoon's want of fidelity to his contractual obligations, it is natural to expect that she would incline to place more confidence in his written than oral promises. And if she felt she made a bad bargain in the property settlement agreement, although not apparent to us, why did she wait over 10 years until this suit was brought by her daughter to allege the unfairness of the agreement and too late for Mr. Witherspoon to deny the existence of the promise which she now asserts in her daughter's behalf?

The foregoing are among the circumstances which compel a conviction that evidence adduced in support of the testamentary agreement is not convincing. It has the tinge of an afterthought, born 10 years after its alleged happening. In coming to this conclusion we have in mind the cogent observation of Mr. Justice

McBride in *Hawkins v. Doe,* 60 Or 437, 445, 119 P 754, Ann Cas 1914A 765 (1912), where he said:

> "Where specific performance of an oral contract to convey land is sought to be enforced, on the ground of performance by the vendee, the evidence of the terms of the contract should be clear and satisfactory. * * * It is so easy for self-interest to sway even the honest mind, so that it will give a different meaning to the language used, or construe rather than repeat actual conversations, that disinterested testimony is highly desirable, nay, almost indispensable, in cases of this kind. Our statute requires the judge presiding at jury trials to instruct them that evidence of the oral admission of a party should be viewed with caution (Section 868, L.O.L.), and, if this is the rule as to admissions of parties living and able to explain their language and meaning, with how much greater force should it apply when the evidence is directed to the alleged declarations of one whose lips are sealed in death, and to establish a contract which the law requires to be in writing."

See, also, *Barchus v. Pioneer Trust Co.,* 229 Or 268, 366 P2d 890, which has many factual and legal attributes in common with the case at bar. Moreover, evidence of the former Mrs. Witherspoon is lacking in corroboration.

The foregoing conclusion relieves us of the necessity of examining further facets of plaintiff's argument which in the main depends upon a belief in the testimony of Mrs. Witherspoon.

The decree of the circuit court is affirmed.