Argued January 18; affirmed February 19, 1935

## VANDIVER ET UX. *v.* STONE ET AL.

(41 P. (2d) 247)

*T. S. McKinney,* of Lakeview (Vern E. Thompson, of Joplin, Mo., on the brief), for appellants.

*Herbert P. Welch,* of Lakeview (McCamant, Thompson and King of Portland, on the brief), for respondents.

BELT, J. This is a suit to enforce an alleged oral agreement to will certain property to plaintiff, C. V.

Vandiver, in consideration of work and personal services to be rendered during the lives of the promisors. From a decree sustaining the contract and impressing upon the property of the estate of Lewis A. Carriker, deceased, a trust to enforce the same, the defendants appeal.

Lewis A. Carriker and his wife were an aged couple who lived on a large cattle ranch about 18 miles from Lakeview in Lake county. They had no children. Their nearest relatives were two nephews—one who resided in Los Angeles and the other in Arizona. The remaining relatives lived in Illinois. In February, 1931, Mr. Carriker died testate at the age of 84 years, leaving an estate of the appraised value of $66,000. His wife, aged 70 years, predeceased him on December 31, 1926, leaving him as her sole heir at law. The testator devised and bequeathed all his property to his various relatives, who are defendants herein. The plaintiffs were not named in the will by Mr. Carriker as beneficiaries of his estate. Hence this lawsuit.

The plaintiffs, together with their two children, came to Lake county in March, 1925. C. V. Vandiver was a skilled carpenter and was regularly employed by the Pullman company in California. He became acquainted with the Carrikers through his mother who resided near them and was considered one of their close friends. Soon after arriving in Lake county, Vandiver established his home about one and one-half miles from the Carriker ranch and, during the course of the year, worked at various jobs for this old pioneer couple. When carpenter work was done on the ranch Vandiver was paid at the rate of $4 per day, although the going wage for such work at that time was from $6 to $8 per day. Mrs. Carriker was not well so an arrangement was made whereby Mrs. Vandiver did

the housework, including the ironing and washing, at the rate of $1 per day. When Vandiver fed and cared for the large number of horses, mules and cattle on the ranch, he was paid $1.50 per day. He also spent much of his time in riding about the ranch with Mr. Carriker who, it seems, was an outdoor man even at his advanced age. It was during such period of time, according to the evidence on behalf of the plaintiffs, that Mrs. Carriker often expressed the desire "to have some one stay with us that would do as we want them to  *  *  *  as we are getting old". This relationship continued for about one year and then it was, as alleged by plaintiffs, that a contract was made with the Carrikers, on August 5, 1926, as follows: "That plaintiff, C. V. Vandiver, would abandon his regular occupation as a carpenter, and throughout the remainder of the lives of both the said Lucy Carriker and the said Lewis A. Carriker, plaintiffs should be the personal companions and aides of the said Carrikers, giving to them personal care and attention, looking after their physical welfare and assisting in household duties at the said Carriker farm home; that in consideration of said personal services, care, attention and companionship to be performed and accorded by plaintiffs, the said Lewis A. Carriker and/or his said wife, Lucy Carriker, whoever should survive the other, would leave a last will and testament by which he or she would bequeath to plaintiff, C. V. Vandiver, the sum of five thousand dollars ($5,000) and would grant and devise to said plaintiff" the home ranch, consisting of approximately 340 acres of land.

The plaintiffs allege, and have offered evidence in support thereof, that they have fully performed the work and services on their part to and including the time when Carriker died in February, 1931. However, before considering the character of the work and serv-

ices rendered by plaintiffs, we deem it proper first to determine whether it is established by clear and convincing evidence that the contract was actually made. It is not considered necessary to restate the law applicable to such contracts in view of the numerous decisions of this court: *Matthews v. Taylor,* 142 Or. 483 (20 P. (2d) 806); *Brennen v. Derby,* 124 Or. 574 (265 P. 425); *Mathews v. Tobias,* 101 Or. 605 (201 P. 199); *Woods v. Dunn,* 81 Or. 457 (159 P. 1158); *Kelley v. Devin,* 65 Or. 211 (132 P. 535). In some of the cases the contracts have been upheld, while in others a contrary view has been taken depending upon the degree of proof and the nature and character of the services rendered. It will thus be seen that each case depends upon its own peculiar facts and circumstances.

After the alleged execution of the above contract, the Vandivers moved from their original location to a house about one-fourth mile from the Carriker home in order better to look after their welfare. Mrs. Carriker often put a lamp in her window to advise the Vandivers that they were needed and it appears from the evidence that, regardless of the time or the condition of the weather, the response was always prompt. During the year preceding the death of Mr. Carriker, the Vandivers moved to the ranch home in question and remained there until the executor undertook the administration of the estate.

■■ Plaintiffs assert that, on the 5th day of August, 1926, the contract was made in the Carriker home as they sat around the dining table at noon. Vandiver thus testified: "We had the contract at noon. They had been talking about it themselves, and they had it fixed up, and Mrs. Carriker said, 'We are ready to tell you about that contract, what we are willing to do'. I said 'All right, let's hear it'. She says 'If you and

Fern will stay with us * * * and do as you have done in the past, drop everything to come and work for us, anything we want done, little things as well as big things, important for us, and quit wherever you are working, and whatever you are doing, to come at our request, that we will will you this ranch and five thousand dollars'. I says to her, my wife, 'What do you think about it', and she says, 'All right'. I says 'We will take you on, I think we can treat you half right any way'.''

S. C. Osborn, a rancher who resides in Lake county, testified that in the fall of 1930 he had a conversation with Carriker, near the First National Bank in Lakeview, and the latter ''spoke about having a will fixed up, said he didn't get quite through. He wanted to fix Van [Vandiver] up''. Leslie Burns testified to the following conversation with Carriker at the home ranch: ''I said 'What do you want to be fooling with cattle, a man of your age—you got plenty to keep you the rest of your days—who will take care of it when you are through with it—the heirs will be lawing it off', and he says 'I am old, and I am going to fix it in a shape there will be no lawsuit', and he went ahead telling me about the heirs, I could not tell how many he did say, some of her heirs and some of his heirs, and he mentioned Van and his wife, and said he was going to help them out too. I said, 'I don't know anything about it, or what you are to do, but it looks to me the way they are staying, they are entitled to something', and he says 'I am going to see they get this ranch and some money to run on, and I also intend to help Tom Hughes' boys, but I am going to put that in such shape Tom won't get it'.'' George Stockburger, who lived about two miles from the Carriker ranch, testified that in various conversations both Carriker and his wife in

substance said that "they (Vandivers) would never be sorry for staying with us—they would be well paid for it". Mrs. Stockburger testified to the same effect. C. A. Pierce, a Lake county rancher who was friendly to the Carrikers, in response to the question, "Can you tell what he (Carriker) said about that contract?" thus answered, "I think I can—he told me that Mr. Vandiver and his wife had been awfully good to him, said he had one of the best housekeepers he thought money could buy anywhere, and he said 'I am going to fix them up—when I am through with this place, I intend to give them this home place and five thousand dollars. That ought to fix them up so they could get along all right.' " This witness said that, at another time, he was replacing an old rail fence between the Carriker ranch and the Becraft ranch. Some question arose about its true location and he asked Carriker about it who replied, "Van will be out after a while, ask him—this ranch will belong to him finally." John Morris, who has lived in Lake county over 40 years, testified that, about one month before Carriker's death, they had a conversation in Dr. Stone's office in Lakeview. He states that Carriker spoke of the kind of treatment he was receiving from the Vandivers and said that he expected "to fix them up for taking care of me". J. W. Robert, a neighbor rancher who has lived in Lake county for many years, said that, in the fall of 1930, Mr. Carriker told him that "Mr. Vandiver might need help himself some day, need witnesses or something of that kind * * * he figured on willing him the home place".

Mr. Arthur D. Hay, now circuit judge, acted as attorney for Carriker for many years. He testified that, in the summer of 1930, Carriker came into his office at Lakeview to consult him about some business

transaction and while there said "that in case anything happened to him, he wanted me.to know he settled with Mr. Vandiver every month, and I asked him why he should want to tell me that, and he said 'Van has asked me how to go about making a claim against an estate, and I have been thinking about it, and I cannot think of any estate he could have a claim against, if it is not mine, * * . *.' " We might inquire: Why was Carriker concerned about any claim that Vandiver would make against his estate? Was he conscious of some obligation to the Vandivers on account of the unusual services which they rendered?

Viewing the evidence in its entirety—some of which has been quoted above—we think the contract as alleged has been clearly established. We think it is not reasonable to assume that the Vandivers would have thus changed the course of their lives and stayed on this ranch doing work of such a personal nature unless they had been led to believe that Carriker would keep his part of the contract. The services rendered by the Vandivers were of such peculiar and personal nature that it would be difficult to estimate their value. Here was an old man who, although vigorous for his age, required constant care and attention. Due to dysentery, he often soiled his linen and bedding. It was almost daily washed by Mrs. Vandiver. He was followed around and nursed by these plaintiffs as if he were their own father. When he rode about the ranch and did not return at the expected hour it was always "Van" who trailed him down. As a matter of fact both of these plaintiffs were subject to his every beck and call. Such services are not compensable in money. Hence, equity intervenes that a fraud may not be perpetrated on those who, in good faith, perform services of the kind involved in this case in reliance upon the

belief that the other party will perform his part of the agreement.

It is not considered proper to set forth in detail the numerous facts and circumstances from which we have concluded that the plaintiffs are entitled to prevail. It would require many pages of the reports so to do. We are content to state briefly some of the salient facts which convinced the trial court, and which convince us, that justice demands the enforcement of this oral contract to devise and bequeath property.

■ There is no merit in the motion of the defendants for judgment on the pleadings as a clear issue of fact was involved.

It follows that the decree of the lower court is affirmed.

CAMPBELL, C. J., and ROSSMAN and KELLY, JJ., concur.