Motion to dismiss appeal denied December 14, 1943; argued February 16; modified March 14; argued on rehearing at Pendleton May 2; appeal dismissed as to defendants and former opinion adhered to as to cross-appeal May 16; rehearing denied May 23, 1944.

## HUNTER *v.* ALLEN ET AL.

(147 P. (2d) 213, 148 P. (2d) 936)

Before B<small>AILEY</small>, Chief Justice, and K<small>ELLY</small>, L<small>USK</small>, B<small>RAND</small> and H<small>AY</small>, Associate Justices.

*Max S. Taggart,* of Ontario, for appellants.

*James T. Donald,* of Baker (Hallock, Donald & Banta, of Baker, on the brief), for respondent.

HAY, J.

Jason Hunter was a cattle raiser and rancher, and owned stock ranches in Malheur and Harney Counties. He died in the year 1916, intestate, and left surviving him a widow, Malinda A. Hunter, who was his second wife, and ten children, five of whom were the issue of his first marriage and five of his second. The widow, at the time of Hunter's death, was about sixty years of age. She determined to continue the operation of the stock ranches, and, with that end in view, acquired the interest of all of the children in the property of her late husband. The plaintiff, Clarence J. Hunter, is the oldest of the five children of the second marriage. At the time of his father's death, he was about thirty-one years old. He had been employed by his father as a rider and ranch hand, and continued in the same employment for his mother as administratrix of his

father's estate. The administration was closed in 1918. Malinda A. Hunter died, intestate, April 24, 1942.

The plaintiff instituted this suit against the administrator of his mother's estate and her heirs at law other than himself, that is to say, his brothers, Elmer, Ralph and George Hunter, and his sister, Edith E. Allen. He sought to have it judicially determined that there was a partnership between his mother and himself in the livestock business, and that, by the terms of their agreement, he became and is now the owner of an undivided one-half interest in all of the partnership property of every description, and to have the court declare furthermore that, by virtue of an agreement between himself and his mother and the full performance of such agreement upon his part, he became, at her death, the equitable owner of certain lands in Malheur County, referred to as the home ranch, the George Hunter homestead, the Desert Claim, and the School Land, the legal title to which stands in her name. His amended complaint, after setting forth the legal description of all of the lands in Malheur and Harney Counties owned by Mrs. Hunter at the time of her death, alleges that, subsequent to the death of Jason Hunter, Malinda A. Hunter and the plaintiff entered into an oral agreement to operate and manage the ranch properties and the personal property as "full and equal partners"; that plaintiff would contribute to the venture $3500 in cash, and would "continuously devote his work, labor, services, time, skill and attention to the operation and management of the said properties"; that, in consideration of his so doing, he and his mother would jointly own the personal property and the increase therefrom and share equally the income of the ranch properties; and that, at Mrs. Hunter's

death, plaintiff would receive and own one-half of all the real property at that time owned by her. It is alleged that he accepted "said offer" and, in reliance upon it, thereafter devoted all of his time and skill to the operation and management of the ranches and personal property; that the partnership continued until the death of Mrs. Hunter; that in 1928 or 1929, at a time when the partners moved their headquarters from Harney County to Malheur County, the agreement was modified to the extent that, instead of plaintiff receiving, at the time of his mother's death, an undivided half interest in all of the lands then owned by her, it was agreed that he should receive, in lieu thereof, all of her lands in Malheur County. The amended complaint alleged further that Mrs. Hunter and Clarence, as copartners, from time to time invested the income of the partnership operation in the purchase of farm equipment, livestock and other personal property, and set forth a description of the personal property which belonged to the partnership at the time of Mrs. Hunter's death.

The defendants, by their answer, took issue with the main allegations of the amended complaint, denied that the plaintiff is entitled to any interest in the real property, title to which stood in Mrs. Hunter's name at the time of her death, denied the existence of any partnership between Mrs. Hunter and the plaintiff; alleged that plaintiff was merely an employee of Malinda A. Hunter's, and worked for her on her ranches and assisted her to some extent in the management thereof; alleged that the employment was a "loose 'mother and son' sort of an arrangement with no definite or specific arrangements between them for his compensation"; and alleged that Mrs. Hunter, at all times, retained the

sole and exclusive management, control and ownership, of the ranch properties and of the livestock business.

After a hearing in due course, the trial judge made findings of fact, whereby he found generally in favor of the plaintiff, and a decree was entered accordingly. The defendants, except the defendant Edith E. Allen, have appealed, and the plaintiff has cross-appealed with respect to a portion of the decree, as hereinafter mentioned.

■■ Although their answer denied its existence, the appellants now admit that the evidence shows that there was a partnership between Mrs. Hunter and the plaintiff. They contend, however, that the trial court erred in finding that the partners, without regard to their respective ratable contributions, each owned an undivided one-half interest in the partnership assets at the time of Mrs. Hunter's death. It must be conceded, in the absence of evidence showing a different intention of the parties, that, on dissolution of a copartnership, the capital assets, after settlement of the partnership debts, should be divided among the partners in proportion to the amounts which had been contributed thereto by them respectively. The amount contributed by each partner is looked upon as a debt of the firm to him. 47 C. J., Partnership, section 861. Usually, a partner who contributes no capital, but merely devotes his time, skill and services to the business, is not entitled, on dissolution of the partnership, to any share in the firm capital, but is limited to his share in the profits of the enterprise as compensation for his services. 40 Am. Jur., Partnership, section 348; Anno., L. R. A. 1917E, p. 877.

■ Of course, copartners may agree among themselves in what proportion the assets of the copartner-

ship, including the capital assets, may be divided between them upon dissolution. 47 C. J., Partnership, section 861; 40 Am. Jur., Partnership, section 348. The respondent's case is based upon the allegation that his mother and he, in forming their partnership agreed that they were to be equal owners of the partnership assets, and were to share equally in its profits. The appellants say that there was no satisfactory evidence of any agreement between the parties, which would justify, upon dissolution, any other division of the capital than one based upon the proportionate shares contributed thereto by each. Almost the whole of the capital contributions were made by Mrs. Hunter, and the appellants contend that the evidence is too weak and inadequate to justify a finding that there was any specific contract whereby the plaintiff became owner of one-half of all of the assets.

The capital of the partnership consisted of Mrs. Hunter's one-half interest in the Jason Hunter personal property, the children's interests therein, which she purchased, whatever moneys she may have had on hand in 1918, a legacy of $2375, which she received in 1931, and contributions by Clarence Hunter of $3500 and a small sum (the amount of which was not disclosed), which he derived from the sale of some horses.

In 1918, when, as it is alleged, the partnership was formed, Malinda A. Hunter was sixty-two years old. Considering her age and sex, it is improbable that, without assistance, she could have continued the business and given it the active supervision and control which were essential to its successful operation. Livestock ranching in eastern Oregon is a strenuous business, calling for hard physical labor, backed by experience and sound judgment. It involves, moreover, a constant

fight against the inroads of cattle rustlers and of predatory animals, and shrewd planning to guard against animal pestilences and the ever-present dangers of drought. It is no business for an old woman, but, on the contrary, one requiring supervision by a strong, able and experienced man. It is undisputed that, from 1918 until Mrs. Hunter's death, a period of twenty-four years, Clarence Hunter devoted his full time unremittently to the operation of the livestock business upon the Hunter properties, with hardly a day off in all of that period. All that he received in return was his board, necessary clothing and tobacco money. He testified respecting the making of the agreement. He said that, after his father's estate was closed in 1918, he had a conversation with his mother in which she told him that "if I would stay there on that place and work I could have half the income and if it was sold I could have half of it and until she died I could have all of half of it and she divided, have half of the estate, understand?" On being questioned further, he said:

"* * * one day, we was talking about it and she would go and do things, and she told me that day she would give me half of this stuff, half of the income that came in and due her when we disposed of it, on everything. When we disposed of it I was to get half of the property. If she died I was to get half of it, her part. * * * I told her, all right, I would do it."

Clarence Hunter was thirty-three years old at that time, and was an experienced rancher, having worked for his father since his boyhood and for his mother during the two years while she was administratrix of his father's estate. In 1919, within a year after the formation of the alleged partnership, he joined with his

mother in the execution of promissory notes aggregating $7900, in favor of the Oregon and Western Colonization Company, for the purchase of lands in Harney County (referred to as the Road Company Lands), which were necessary or convenient for the prosecution of their business. In 1920, the last of these promissory notes was paid, and the lands were conveyed to Mrs. Hunter.

The late Judge Robert M. Duncan, who, in his lifetime, was judge of the circuit court for the judicial district which comprises the counties of Malheur, Grant and Harney, and who previously, for many years, was a practising lawyer in the same district, was well acquainted with both Mrs. Hunter and Clarence. He testified as a witness for the plaintiff. He said that he became acquainted with the Hunters in the winter of 1909-10, and thereafter had frequent conversations with them. His relations with them were simply those of a friend or acquaintance, although on one occasion he had done a small amount of professional work for Mrs. Hunter. In the year 1926, or thereabouts, he and another person called on Mrs. Hunter and endeavored to interest her in making a loan to the Burns creamery. Clarence Hunter was not present on that occasion, and Mrs. Hunter would not discuss the matter until he came in from the range. She explained that they were equally interested in the business. Judge Duncan thought that she used the word "partners", but, in any event, he was very positive that she said she could not lend the money without Clarence's consent, because they were equally interested.

The storekeeper at Beulah, which was the nearest settlement to the Malheur County ranch, testified that the ranch bills were paid by the joint checks of M. A.

and C. J. Hunter, and that Mrs. Hunter invariably referred to the cattle and property as "ours", although the ranch account was carried in the name of M. A. Hunter. John Murphy, a neighboring rancher, testified that Clarence had as much to do as his mother with the management of the ranch and the stock.

In 1935, in an application for a grazing permit under the Taylor Grazing Act, Mrs. Hunter stated that Clarence Hunter, her son, had a joint interest with her in the cattle and horses. Applications for similar licenses in following years stated that "M. A. and C. J. Hunter" owned the livestock. The grazing licenses were issued to M. A. and C. J. Hunter. Charles Lloney testified that, in the fall of 1939, he bought some feeder hogs from Clarence and Mrs. Hunter at the Beulah ranch. He first interviewed Mrs. Hunter, who told him he would have to see Clarence, as Clarence owned "half of these hogs". He then had a conversation with Clarence and bought the hogs. Both Mrs. Hunter and Clarence agreed with him upon the price. He paid by check made payable to M. A. and C. J. Hunter. In 1938, he sold some grain to the Hunters, and was paid by a check signed "M. A. and C. J. Hunter". He thought that Mrs. Hunter wrote the check. John Medlin, a stockman and farmer, who was acquainted with Mrs. Hunter for about twenty years and with Clarence for about thirty-three years, testified that, in 1939, he and two other men bought some cattle from the Hunters. They talked with Mrs. Hunter and told her that they had heard that she had cattle for sale. She said that she did, but that they would have to see Clarence first, as he had a half interest in them. They afterwards talked with Clarence and made him an offer. In their presence, he consulted with his mother and told her of the

offer, to which she responded, "that sounds pretty good. You have got a half interest in them and whatever you say goes with me." The Hunters insisted that they did not want a check but would deal only for cash, so the buyers went to the bank at Juntura and got $2300 in cash, which they paid to Clarence. Ben Starling, a rancher, who was one of the persons associated with Mr. Medlin in the cattle purchase, corroborated his testimony. Joe Holcomb, another rancher, testified that, in 1941, he bought some steers from the Hunters. He looked over the steers and made Clarence an offer, who said that his mother had an interest in them and he would have to talk with her. He thereupon went to the house and consulted with his mother, who said, in the presence of the witness, "What do you think?" to which Clarence responded: "Well, I would rather you would say". Mrs. Hunter then said: "Well, you have as much interest in them as I have so whatever you make the deal for it is all right with me." They thereupon agreed upon a price, and the transaction was closed. On delivery of the steers, Mr. Holcomb paid for them by a check payable to M. A. and C. J. Hunter, which check was produced in evidence. John Corbett, of Weiser, Idaho, a dealer in cattle, was interested with Mr. Holcomb in the steer purchase. He testified that Clarence told him that his mother owned an interest in the cattle "just the same as I do". He said that, on several occasions, Mrs. Hunter said that she and Clarence were "in together there". To Ina Tackett, she said that Clarence had stayed home and put up with her nagging and crabbing at him, and that he deserved to get what was in the place. She told Jessie Hunter, a daughter of the defendant George Hunter, that "the way the property

stood now (apparently about 1940) her and Clarence had half and half, it was half his and half hers and that when she died her share was to be divided, the greatest part of it was going to Clarence * * * because she said he had stayed and helped her when the rest of them had not and she felt that he deserved it.''

For a number of years prior to Mrs. Hunter's death, the personal property of the outfit was assessed jointly to M. A. and C. J. Hunter. The tax receipts were issued to M. A. and C. J. Hunter as early as the year 1931. Bulls which they purchased were registered in the names of both, the title to an automobile was taken in their joint names, and the state license therefor was issued to them jointly. Beginning about the month of November, 1931, the bank account was carried under the names of M. A. and C. J. Hunter, and the checks were signed "M. A. and C. J. Hunter". Dick Wilson, a farm-hand who had worked on the Hunter ranch in 1933, testified that Mrs. Hunter told him that she was going to leave Clarence all of her estate because he had stayed with her all his life, and that they were "full partners on the ranch and cattle". In 1940, the Hunters purchased two tracts on Lost Creek, in Malheur County, from persons named Deen and Birge. Deen testified that, during the negotiations for the purchase of his land, Mrs. Hunter said to Clarence: "We had better have our money in land than have it in the bank at three per cent." Mr. Deen was in immediate need of money, because of the fact that his daughter was ill and needed medical care. He explained his predicament to Mrs. Hunter, who said: "Clarence and I will loan you this money", but he refused the offer, saying

that he was "too many years along to take on any indebtedness."

The appellants introduced evidence which tended to place a different construction upon the relationship of Mrs. Hunter and Clarence. For example, they showed that the livestock brands owned by Mrs. Hunter were never transferred to the firm name; that, in 1925 and 1926, about 1360 acres of grazing land was purchased in Harney County, and title thereto was taken in the name of Mrs. Hunter; that, in 1929, when Mrs. Hunter and Clarence moved from the Harney County ranch to the Beulah ranch in Malheur County, the defendant George Hunter sold a section of land adjacent to the Beulah ranch, which he had homesteaded, to his mother, who took title in her name. Title to the lands purchased in 1940 from Deen and Birge was taken in the name of Clarence Hunter, and the appellants argue that the evidence indicates that this land was purchased in Clarence's name in repayment of the $3500 which he had put into the business. Until about 1931, all the affairs of the business were conducted in the name of Mrs. Hunter, the bank accounts stood in her name alone, and all checks were written and signed by her. The livestock and other personal property was declared to the county assessor to be her individual property. Such income tax returns as were filed were in the name of Malinda A. Hunter, and no partnership returns were filed. In the 1938 income tax return, the appellants say that a deduction was made for wages paid to Clarence Hunter. As a matter of fact, however, the item in question appears upon a work sheet which is attached to a copy of the return, and states simply, under the head of "Labor", "Son, $600". Presumably the son referred to is Clarence, although Mrs. Hunter

had three other sons, and at least one of them worked for her at different times. Moreover, there is no direct evidence that the sum was actually paid to Clarence.

We gather from the evidence generally that Mrs. Hunter and Clarence were rugged individualists, who minded their own business and discussed it with but few people. George Hunter, one of the appellants, testified on cross-examination:

"A. Well, I had been with her off and on for close to 40 years at that time (1935), and her own relation never got any information out of her, and as I knew her she wouldn't tell any stranger, that is, anybody that she just had met, I seen that a dozen times or so, she wouldn't tell any of her business.

"Q. She would tell a man like Judge Duncan what the facts were, wouldn't she?

"A. Well, Judge Duncan wasn't a stranger."

4. Mr. S. J. Claridge, general agent in Oregon and Washington for The Reserve Life Insurance Company and a member of the Oregon Bar, testified that Clarence Hunter, in October, 1940, had taken out a policy upon his life in the sum of $25,000, in which the beneficiary was Malinda Hunter, his mother. In the fall of 1941, at about the time when the second premium on the policy became due, Mr. Claridge called at the Beulah ranch and spent the night there. His purpose was to discuss the policy with Mr. Hunter, as he was of the opinion that the amount was too great, and he felt that the agent who had written it "had over-reached himself". He thought that he owed it to Mr. Hunter to discuss the matter with him and make sure the policy was written as he wanted it, with the idea of cutting it down to whatever amount Clarence thought

that he could carry. Mr. Claridge explained to Mrs. Hunter and Clarence the purpose of his visit, and a general discussion followed. Mrs. Hunter finally said that anything that was worth doing at all was worth doing well, and that it would be just as well to be worth while if they were going to pay the premiums. She thereupon wrote a check for the second year's premium. During Mr. Claridge's stay at the ranch, he gathered from their talk that Mrs. Hunter and Clarence had a partnership agreement of some sort. Mr. Claridge suggested to them, in effect, that there was danger in leaving the situation ''so indefinite''; that they should either have a written partnership agreement, or, as Mrs. Hunter was getting along in years, that she ought to have a will drawn particularly setting forth ''what she wanted done and what disposition she wanted to make of her property. She said: 'Mr. Claridge, that is exactly what I have been thinking about for a long time and if you could take care of that I would greatly appreciate it.' '' Mr. Claridge then asked her who were to be her beneficiaries, and she indicated that she desired to leave all of her property to Clarence. Mr. Claridge suggested that ''the other heirs'' should be mentioned; that something had to be done with them. Mrs. Hunter finally decided that, subject to some minor bequests, Clarence should have all of the property except the Crane Creek ranch. Mr. Claridge came to the conclusion that the best arrangement would be for each partner to make his own will, devising to the other the property of which he should die seized. He testified that there was no question but that there was a partnership between Mrs. Hunter and Clarence. The upshot of the matter was that, after Mr. Claridge returned to Portland, he prepared wills for both Mrs.

Hunter and Clarence. Mrs. Hunter's will was never signed, because she decided to have it acknowledged before a notary public, and she died before she was able to leave the ranch for that purpose. Mr. Claridge said that he tried to tell them how to have the wills signed, and suggested that they could get a couple of their neighbors to act as witnesses, but the old lady said, "No, I won't have any neighbors know anything about my business. I will go down and have it signed in Vale." Mrs. Hunter's unsigned will, which is in evidence, bequeaths to Clarence J. Hunter all of her personal property, all moneys in bank, choses in action and securities, cattle, sheep, farm equipment and all personal property of every description owned or possessed by her at the time of her death, and devises to him the Beulah ranch and improvements, the George Hunter homestead, the Desert Claim and the School Land, which comprise all of her land in Malheur County. It directs her executors to sell and dispose of the Crane Creek ranch, and to divide the proceeds between her children, Elmer N. Hunter, Ralph G. Hunter, Edith E. Allen and Clarence J. Hunter, and her grandson, Gilbert Wilbert Hunter. To her son George Hunter she bequeathed the sum of $100, as his sole share in her estate. Clarence J. Hunter was named as residuary legatee. While, of course, the unsigned will had no effect whatever, nevertheless we think it tends to confirm the partnership agreement as testified to by Clarence Hunter. From all of the evidence, we are of the opinion that the agreement of the partners respecting the division of the partnership assets was sufficiently established.

The law with respect to oral contracts to devise or convey real property has been the subject of numer-

ous decisions of this court. Such transactions are regarded with suspicion, and will be carefully scrutinized. The contract must be established by clear, concise, convincing and satisfactory evidence, and it must be just, reasonable and mutual in its terms. *Magness v. Magness,* 148 Or. 44, 33 P. (2d) 1005; *Losey v. O'Hair,* 160 Or. 63, 83 P. (2d) 493; *Harris v. Craven,* 162 Or. 1, 91 P. (2d) 302; *Brennen v. Derby,* 124 Or. 574, 265 P. 425; Anno., 101 A. L. R., 949, et seq. It is competent for the owner of real property to contract with another to devise such property to him. *Kelley v. Devin,* 65 Or. 211, 132 P. 535; *Woods v. Dunn,* 81 Or. 457, 159 P. 1158; *Popejoy v. Boynton,* 112 Or. 646, 229 P. 370, 230 P. 1016; *Traver v. Naylor,* 126 Or. 193, 268 P. 75; *Vandiver v. Stone,* 149 Or. 426, 41 P. (2d) 247. Such a contract, however, is within the statute of frauds, and hence is unenforceable and void unless the performance thereof is sufficient to take it without the statute. Sections 2-905 and 2-909 (6), O. C. L. A.; *Brown v. Lord,* 7 Or. 302; *Roberts v. Templeton,* 48 Or. 65, 80 P. 481, 3 L. R. A. (N.S.) 790; *Tonseth v. Larsen,* 69 Or. 387, 138 P. 1080; *Le Vee v. Le Vee,* 93 Or. 370, 181 P. 351; *McCormick's Appeal,* 57 Pa. St. 54, 98 Am. Dec. 191. There must be a strict performance by the promisee of the terms and conditions of the contract. *Losey v. O'Hair,* supra; *Mathews v. Tobias,* 101 Or. 605, 201 P. 199; *Shepherd v. Allingham,* 132 Or. 684, 288 P. 210; *Magness v. Magness,* supra. Moreover, the rendition of the services must be wholly referable to the contract and solely predicated thereon, it must be made to appear that "proper and adequate. compensation for the services cannot otherwise be made", and that the services were "of exceptional character or of such a peculiar value to the promisee that the value thereof

is not subject to pecuniary estimate." *Brennen v. Derby,* supra (124 Or. 574, 265 P. 425); *Vandiver v. Stone,* supra (149 Or. 426, 41 P. (2d) 247); *Woods v. Dunn,* supra (81 Or. 457, 159 P. 1158); *Traver v. Naylor,* supra (126 Or. 193, 268 P. 75); *Losey v. O'Hair,* supra (160 Or. 63, 83 P. (2d) 493).

As suggested by appellants, we shall consider the real property under three groupings. Group 1 consists of the lands owned by Mrs. Hunter in 1918, prior to the formation of the alleged partnership, and includes the home ranch, which is called the Beulah ranch, the School Lands and the Desert Land, all in Malheur County, and the Crane Creek ranch in Harney County. Group 2 consists of all of the lands purchased by the parties subsequent to 1918, title to which was taken in Mrs. Hunter's name. Group 3 comprises the lands bought subsequent to 1918, title to which was taken in name of Clarence J. Hunter.

With respect to group 1, we have given painstaking and sympathetic consideration to the claims of the plaintiff with reference to the alleged agreement between his mother and himself, whereby, in consideration of his services in staying with his mother and assisting her in the management and operation of the properties, she agreed, at first, to devise to him an undivided one-half interest in all of her real property, and later modified this by agreeing to devise to him all of her lands in Malheur County, leaving the Harney County lands to her heirs at law. We find that Mrs. Hunter made definite statements to a number of persons to the effect that she intended to give the Malheur County lands to Clarence, as a reward for his having remained with her so many years and assisting her in maintaining a home and managing and operating the business. For

example, she told Judge Duncan that Clarence was to get all of the land in Malheur County, because he had put into the business the money which he had received from his father's estate, and "had stayed with her, was operating and doing the business for the ranch without any salary at all, he was making a home for his mother and taking care of things that way." She mentioned these matters to Judge Duncan on many occasions, and the Judge definitely understood that there was "a sort of understanding" between her and Clarence in the premises. She told John Murphy many times that Clarence was to have the entire holdings at Beulah, because of the fact that "he had been with her all her life, he never drew any wages, and * * * he had always taken care of the livestock and the ranch." In 1941, Joe Holcomb tried to purchase the Malheur County lands from Mrs. Hunter, but she told him that she did not care to sell, because "when she was gone it went to Clarence, that is because he stayed at home and helped her maintain it a home, if it hadn't been for him she couldn't have kept it for a home, and that he had stayed home all his life and worked there and got nothing for it." In addition, there is the testimony of Mr. Claridge, which establishes beyond question the fact that Mrs. Hunter had made up her mind to devise the Malheur County realty to Clarence. Under all of the circumstances, we have no doubt that he deserved this consideration at his mother's hands, but we find no evidence, other than the testimony of Clarence Hunter himself, which clearly establishes the existence of a contract to devise the real property, as distinguished from a mere intention on the part of Mrs. Hunter to devise it because of her appreciation of his having remained with her so many years. Indeed, we

are of the opinion that the evidence is more susceptible of the interpretation that Mrs. Hunter's testamentary intention, with regard to the real property, was based upon feelings of gratitude rather than upon a contract. So far as the actions of Clarence Hunter are concerned, which he claims to have done in performance of the alleged contract to devise, such actions were clearly referable to his duties under the copartnership. As said by Mr. Justice Cardozo in *Burns v. McCormick,* 233 N. Y. 230, 135 N. E. 273:

> "What is done must itself supply the key to what is promised. It is not enough that what is promised may give significance to what is done."

While there was a change in the relationship between Clarence and his mother after the partnership in 1918, in that, from being a hired hand, he became a co-manager of the business, superintending the active operation thereof, engaging and discharging employees, and participating with Mrs. Hunter in sales and purchases, there was nothing whatever to indicate the existence of any contract by Mrs. Hunter to devise any part of her real estate to him. His possession of the real property was at the most the possession of a partner, and had none of the indicia of possession by one claiming an interest therein, present or prospective. If equity should act to compel the specific performance of an alleged contract to devise real property, proved unequivocally only by the testimony of the claimant, the statute of frauds might as well be abrogated. Having weighed all of the evidence in the light most favorable to Clarence's contentions, we are impelled, albeit with some reluctance, to the conclusion that he failed to establish the alleged contract by clear and convincing evidence. *Brown v. Lord,* supra (7 Or. 302); *Le Vee v.*

*Le Vee,* supra (93 Or. 370, 181 P. 351); *Brennen v. Derby,* supra (124 Or. 574, 265 P. 425); *Magness v. Magness,* supra (148 Or. 44, 33 P. (2d) 1005); *Losey v. O'Hair,* supra (160 Or. 63, 83 P. (2d) 493).

 The respondent insists that, where services are performed by a child for a parent in consideration of an agreement by the parent to devise real property to him, equity will impress the property, in the hands of the administrator or heirs at law, with a trust in favor of the promisee, who has completely performed the agreement, and will compel a conveyance in accordance therewith. As a general proposition, this is no doubt unexceptionable, although, as has been stated, it is necessary to establish the contract by clear and unequivocal proof, and the services rendered must be referable to and induced by the contract, and must have been done with a view to its complete performance. The near relationship of the parties did not of itself even tend to prove the existence of a contract such as is here alleged. The fact that Clarence preferred to stay with his mother under a copartnership arrangement was neither unusual nor extraordinary. We think that he thereby took advantage of what was, under the circumstances, a good business opening for him. He certainly did not "change the course of his life" by reason of the alleged contract. On the contrary, upon the formation of the partnership, he was promoted from hired man to part owner in a substantial and established enterprise in the very business which he had theretofore chosen to follow. Notwithstanding the fact that he drew no wages, it is apparent that his expected share of the profits was a sufficient reason for his entering into the copartnership agreement.

In *Kelley v. Devin,* supra (65 Or. 211, 132 P. 535), this court approved the specific performance of a contract to convey land in consideration of services performed by a son for his father. In that case, however, there was no express contract providing for compensation other than the agreement to convey, and, the transaction being between father and son, the plaintiff was without remedy at law. The services in that case moreover were definitely referable to the contract to convey, and not, as here, at least equally referable to a partnership agreement.

■ The appellants, in their brief, concede that the lands in group 2 should be considered as partnership property, having been purchased with partnership funds. This group includes the Road Company lands and the Carey-Spencer lands in Harney County and the George Hunter homestead in Malheur County.

■ Group 3 comprises the lands bought subsequent to 1918, title to which was taken in the name of Clarence J. Hunter. This group consists of the Lost Creek lands in Malheur County, acquired in 1940 from Deen and Birge. By that time, it was quite evident (irrespective of the question of any contract) that Mrs. Hunter had formed the intention of giving or devising the Malheur County lands to Clarence. Clarence's explanation of the matter is that it was his mother's intention that he should have all of the lands in Malheur County in any event, so, in order to avoid a roundabout method of achieving that result in this instance, the Lost Creek lands were caused to be conveyed directly to him. The explanation is reasonable, and consistent with Mrs. Hunter's expressed intentions. We construe the transaction as in the nature of an executed gift, and hold

that these lands must be considered as the property of Clarence J. Hunter.

■ Mrs. Hunter and Clarence carried a savings account in the Ontario Branch of the United States National Bank of Portland in the names of "M. A. or C. J. Hunter"; and a checking account with the Bank of Malheur in the names of "M. A. and/or C. J. Hunter". The complaint alleges, and the answer of the defendants admits, that said accounts were "held jointly in the names of Malinda A. Hunter and the plaintiff, to be paid upon the death of either of them to the survivor exclusively and that by reason of the death of said Malinda A. Hunter are now the sole and exclusive property of the plaintiff." The lower court, however, in the face of this admission and without any evidence of the intentions of the parties other than the form of the deposits, held that these accounts were partnership property. We think that this was error, and that, in view of the admission and of the evidence, they must be considered as being the individual property of the plaintiff, Clarence J. Hunter. *In re Edwards Estate,* 140 Or. 431, 14 P. (2d) 274; *Beach v. Holland,* 172 Or. 396, 142 P. (2d) 990.

The decree appealed from is modified to the extent that the credit balances in the two bank accounts, standing in the names of M. A. or C. J. Hunter, are decreed to be the individual property of the plaintiff, Clarence J. Hunter; that the real property described as the Road Company lands and the Carey-Spencer lands, in Harney County, and the George Hunter homestead, in Malheur County, shall be considered and regarded as partnership assets, and dealt with as if partnership personalty in the winding up of the partnership; and

that the real property comprising the Beulah ranch, the School Lands and the Desert Land, in Malheur County, and the Crane Creek ranch, in Harney County, are vested in the plaintiff, Clarence J. Hunter, and the defendants, Edith E. Allen, Elmer N. Hunter, Ralph G. Hunter and George Hunter, as heirs at law of Malinda A. Hunter, deceased. In all other respects, the decree appealed from is affirmed. No party shall recover costs on this appeal.

Argued on rehearing at Pendleton May 2; appeal dismissed as to defendants and former opinion adhered to as to cross-appeal May 16; further rehearing denied May 23, 1944.

ON REHEARING

(148 P. (2d) 936)

Before BAILEY, Chief Justice, and BELT, LUSK, BRAND and HAY, Associate Justices.

*Robert E. Lees,* of Ontario (Max S. Taggart, of Ontario, on the brief), for appellants.

*Harold Banta,* of Baker (Hallock, Donald & Banta, of Baker, on the brief), for respondent.

HAY, J.

Prior to submission of this appeal upon the merits, Clarence J. Hunter, the plaintiff-respondent, moved to dismiss the appeal. His motion was based upon the jurisdictional ground that no notice of appeal was served by the appellants upon their codefendant, Edith E. Allen, who, as he contended, was a necessary party to the appeal. In support of the motion, he relied principally upon the argument that a reversal of that portion of the decree which gave respondent only an undivided one-half interest in the joint bank accounts, rather than the whole thereof, which he claimed, would affect adversely the interests of Mrs. Allen, and that, therefore, she was a necessary adverse party. The respondent himself, however, cross-appealed from that

portion of the decree, and duly served all of the defendants, including the defendant Edith E. Allen, with notice of his cross-appeal. This action upon his part, of course, rendered invalid his chief argument in support of his motion to dismiss. Under the circumstances, it appeared to us, after due consideration, that any modification of the decree that might be made by this court would not affect Mrs. Allen's interests adversely. We, therefore, denied the motion, upon the authority of the following cases: *United States National Bank v. Shefler,* 77 Or. 579, 143 P. 51; *Johnson v. Paulson,* 83 Or. 238, 154 P. 685; *Davis v. First National Bank of Albany,* 86 Or. 474, 161 P. 93; *Masters v. Bidler,* 101 Or. 322, 334, 199 P. 920; *Lidfors v. Pflaum,* 115 Or. 142, 205 P. 277; *In re Prince Estate,* 118 Or. 210, 221 P. 554; *Adams v. Kennard,* 122 Or. 84, 91, 227 P. 738.

Subsequent to the rendition of our decision upon the merits (Or. Adv. Sheets, March 14, 1944, 147 P. (2d) 213), the plaintiff-respondent filed a petition for rehearing, and, in connection therewith, renewed his motion to dismiss, urging new and additional reasons in support thereof. Consideration of such petition led us to the conclusion that we should reexamine the jurisdictional question. Upon this question alone, therefore, briefs were submitted and oral argument followed before the court, sitting at Pendleton.

■ The decree gave Clarence Hunter, as surviving partner, a half-interest in the personal property, which was all that he asked for. The appellants contended that this was error, and that he was entitled only to an interest proportional to his contribution to the partnership capital. So far as the personal property was concerned, therefore, it is apparent that any possible modification of the decree would have been advan-

tageous to Mrs. Allen, and, to that extent, she was not an adverse party.

The real property, however, presents a different situation. The lower court's decree gave each of the heirs, including Mrs. Allen, an undivided one-fifth interest in the Road Company lands and the Carey-Spencer lands, whereas our decision gave Clarence, as surviving partner, an undivided one-half interest in those lands, with the remainder to the heirs, including Mrs. Allen, thus reducing Mrs. Allen's interest from one-fifth to one-tenth. The decree gave Clarence the home ranch, the School Lands and the Desert Claim, whereas our decision gave those lands to the heirs, the result being, in Mrs. Allen's case, to give her an undivided one-fifth interest therein. The decree gave Clarence the George Hunter homestead, whereas our decision gave him, as surviving partner, an undivided one-half interest therein, with the remainder to the heirs, including Mrs. Allen. The effect of our decision was to dispose of the real property as if all of the parties were before the court. If the interests of the parties were entirely severable, we might eliminate from consideration those which were awarded to Mrs. Allen by the lower court, and proceed to adjudicate the respective rights of the appellants and of Clarence Hunter in the remainder, but this is not the case. Apparently, we cannot do justice to the respondent, Clarence Hunter, and give him what he is entitled to in the premises, without including within the scope of our adjudication the interests of Mrs. Allen in the realty. On the other hand, we cannot deal with Mrs. Allen's interests, to give or to take away, without creat-

ing a situation under which her interests could be adversely affected.

"The canon established by all our precedents and by which it is determined whether a party is adverse to the appellant is in substance this: that if on the appeal, the interests of a party could be adversely affected, he is entitled to notice of the appeal of another party, in default of which this court will not acquire jurisdiction. On the other hand, if the only possible modification of the decree would better his condition, he is not an adverse party and it is not necessary to notify him."

*Adams v. Kennard,* supra (122 Or. 84, 227 P. 738).

This view of the circumstances impels us to the conclusion that Mrs. Allen was a necessary adverse party and that service of notice of appeal upon her was essential to the jurisdiction of this court. *Johnson v. Shasta View L. Co.,* 129 Or. 469, 278 P. 588; *Vaughan v. Kolb,* 148 Or. 491, 37 P. (2d) 435.

The appeal of the defendants Elmer N. Hunter, Ralph G. Hunter, George Hunter and Elmer N. Hunter as administrator of the estate of Malinda A. Hunter, deceased, will be dismissed, with costs. In so far as the cross-appeal of the respondent, relating to the joint bank accounts, is concerned, we adhere to our former opinion.