Argued November 29, 1949; reversed March 7, 1950

# MAJOVSKI et al. v. SLAVOFF and EVANOFF and SLAVCHOVA et al.

### 215 P. (2d) 674

*Peter A. Schwabe* argued the cause for appellant. On the brief were Haas & Schwabe, of Portland.

*W. L. McFarling* and *Joe P. Price,* of Portland, argued the cause and filed a brief for respondents.

Before Lusk, Chief Justice, and Brand, Rossman, Bailey and Hay, Justices.

BAILEY, J.

This suit was brought by Marleen and Carl Majovski, minors, by Robert Majovski, their guardian, against the executors of the estate of Tom E. M. Poppoff, deceased, Gitsa Evanov Slavchova, and all the unknown heirs of the deceased, for the specific performance of an alleged contract between plaintiffs and decedent wherein the decedent agreed to devise to plaintiffs a tract of land in Multnomah County. From a decree in favor of plaintiffs, Gitsa Evanov Slavchova alone has appealed.

The complaint alleges, and the joint amended answer of the executors and Gitsa Evanov Slavchova

admits, that Robert Majovski is the duly qualified and acting guardian of Marleen and Carl Majovski; that Tom E. M. Poppoff died on March 3, 1947, in Portland, Oregon, and left an estate in Multnomah County consisting of real and personal property; that after his death, and on March 11, 1947, a purported will of said Poppoff, dated November 2, 1940, was filed in the circuit court of Multnomah County, Department of Probate, together with a petition for its probate, and that thereafter Steve Slavoff and George Evanoff, defendants, were appointed executors thereof and ever since that time they have been and now are executors of said estate; that Poppoff was a native of the country of Bulgaria and came to America "on or about the year 1908, and was of the approximate age of 64 years at the time of his death"; that Poppoff was never married and had no near relatives in the United States; that the only near relative he had at the time of his death was a sister, defendant Gitsa Evanov Slavchova, who is a native and resident of the country of Bulgaria; that on or about November 22, 1943, decedent purchased the tract of land here involved; and that decedent "had made a document purporting to be a Last Will and Testament and that said document has been admitted to probate" as his last will and testament.

The remainder of the complaint is denied by said defendants, generally or on information and belief. Briefly, it alleges as follows: That Poppoff was a great friend of plaintiffs and their parents and visited them frequently; that plaintiffs, at various times and on numerous occasions and at the instance and request of Poppoff, visited him at his home; that Poppoff was very fond of plaintiffs and at various and different times would bestow upon them small gifts; and that

the plaintiffs likewise were very fond of Poppoff "and contributed greatly to his comfort and happiness by frequently visiting at his home and performing various tasks which he requested and services which he required and when he was ill or injured, particularly on the occasion when said Tom E. M. Poppoff, now deceased, had received an injury to his arm in the year 1946, at which time plaintiffs would wait upon him, carry warm water in which to bathe and apply to his injured arm." Paragraphs XIII and XIV, which are denied in the amended answer, are as follows:

"That after said Tom E. M. Poppoff had purchased said real property, hereinbefore described, and on or about the 24th day of December, 1943, the said Tom E. M. Poppoff, now deceased, entered into an agreement with plaintiffs herein whereby, in consideration of the many services which plaintiffs and their parents had rendered and the many tasks which plaintiffs and their parents had performed for him and on account of the love and esteem of said Tom E. M. Poppoff, now deceased, for plaintiffs and their parents, and the further consideration that plaintiffs and their parents would perform such services for said Tom E. M. Poppoff, now deceased, as he might request from them during his lifetime, the said Tom E. M. Poppoff, now deceased, promised and agreed to will and devise to plaintiffs all of the real property hereinbefore described.

"That pursuant to said agreement and in accordance therewith, plaintiffs and their parents did furnish, supply and perform all of the services for said Tom E. M. Poppoff, now deceased, which he requested of them during his lifetime, which services consisted of cooking for said Tom E. M. Poppoff, now deceased, by plaintiffs and their mother; preparing different foods on diverse and sundry occasions, such as salads, soups, meats of different kinds and pastries; fix, prepare and make his bed;

perform manual labor in the preparation and tilling of his garden; accompany him down into the city of Portland and assist him in his shopping and making various purchases and in carrying the same from the city to his home; washing various articles of bedding and clothing; canning different fruits and berries; cleaning his house; assisting him with his various electrical appliances; sharpen and put into proper condition for his use tools which he owned; all of which services, duties and tasks were performed at the special instance and request of said Tom E. M. Poppoff, now deceased, all in accordance with the request and at the direction of said Tom E. M. Poppoff, now deceased, and said plaintiffs and their parents did perform all of the labor, services and tasks requested by said Tom E. M. Poppoff, now deceased, as agreed between said parties, as hereinbefore alleged.''

It is further alleged in the complaint, and denied in the amended answer, that Poppoff, in accordance with the terms of said agreement, ''did undertake to will and devise to plaintiffs all of the said real property hereinbefore described''; that there was found in Poppoff's safety deposit box a document in the Bulgarian language, dated February 26, 1946, and which, as far as material here, reads, translated into the English language, as follows:

''In case I die I will the place which I own on 176th and Division Street to Marleen and Carl Majovski, which the place should not be sold, but to keep it for Souvenir from me. The rest whats left to be given to my close relatives if living. If dead then all should be given to the children mentioned above, which I like very much.''

and that said document was enclosed in an envelope addressed to Bob Majovski. In addition to the admissions and denials heretofore mentioned, defendants'

amended answer contains three affirmative defenses, to wit: (1) that plaintiffs gave no valuable or any consideration for the alleged agreement; (2) that any services rendered by plaintiffs, or anyone on their behalf, to decedent Poppoff were rendered voluntarily and not as the result of any contract or agreement and that any services rendered were fully paid and compensated by decedent in his lifetime; and (3) that the purported agreement was for the sale of an interest in real property, that it was not in writing, and that there was no "note or memorandum thereof, expressing the consideration, in writing, and subscribed by this decedent or his lawfully authorized agent", and therefore such purported agreement was void.

The amended reply denies the affirmative matter in the amended answer.

Robert Majovski, guardian and father of the plaintiffs, testified that Marleen was born November 1, 1935, and Carl, January 20, 1938; that he had known Poppoff since 1930, and that he and Poppoff had been born in neighboring villages in Bulgaria; that Poppoff had worked in logging camps most of the time until 1943; that in the wintertime Poppoff generally came to Portland where he, Majovski, visited him; that in 1941, when Poppoff was in Portland he met him and introduced him to his wife, Marleen and Carl, and after that introduction Poppoff came to their home; that thereafter when Poppoff came to Portland week ends from the camp he would come to visit them; that he and his family, after 1941, visited Poppoff frequently in the logging camp; that in 1943 Poppoff decided to quit logging and buy a tract of land near Portland; and that he had driven Poppoff around in his automobile looking at different tracts of land until he

bought the one here involved, which tract of land is located at 176th and Division Streets, outside of the limits of Portland, and is 100 feet by 285 feet in size.

We quote as follows from Majovski's testimony: "And then I had taken him several times looking at different sections of the city to find property. So finally located a place and then he told us that this was the place—'I am going to settle myself for the future, so I will quit the camp and live here in town. Quit the camps. *But this property that I am going to buy I am going to give that to your children after my death.*' But he said, 'Until I am alive it will be used just the same; they will be welcome to come to my place any time, to walk in the house just like your own home.'" (Italics supplied.)

Majovski stated that after Poppoff bought the property he commenced to clean it up and to cultivate it; that "he planted gardens and then he built a little park behind and said, 'This place will be for the children every time they come here to play'"; that the children went out to Poppoff's home every time he and his wife went and every time the children went there Poppoff "asked them to help him clean up the place and he told them lots of times * * *, 'This is your place. That is what I am fixing it up for, you mostly.'" Asked whether Poppoff had indicated how he was going to give the property to the children Majovski stated that he said: "I always leave something black and white to be a law for sure that I am going to leave it to anybody, if I want to. * * * This place I am going to leave to your children * * * for a souvenir to have that from me."

It was testified by Majovski, who is a carpenter, that he helped Poppoff repair and finish the buildings

on the place and that his son Carl was asked to help Poppoff "carry anything a little bit, nails and lumber, stuff like that", and that Carl would help "him a little. He was asking him to do what he can do about—not heavy work, except to hand him the saw and nails, stuff like that." Majovski said that he did not receive or ask for compensation for the work he did for Poppoff because "I just thought to myself as long as he promised that place to the children, he was going to give it to the children, why, I just thought it was no business of charging him anything because this place was for the children."

On cross-examination Majovski, in answer to the question as to what services Carl rendered to Poppoff, said:

"He [Poppoff] usually come—when he had the place, as he passed by our place when we lived on 26th and Division, he stopped there, had got his transfer to town, and he ask to take the children with him. He wants to go buy groceries in town and to help him out to carry them. He had his arm injured once. So he said, 'I can't carry very heavy, so I will ask the children to come with me in town and work around there so they will help with the carrying of some of the groceries that I need.' He usually come every Saturday. And then at the place—every time they go. When he had a garden, they help him to plant some flowers and some onions and all kinds of vegetables and he was digging another part of that place which was full of that Johnson grass, so he was asking them to help him out to pull the grass and picking up around there and making a big pile there. So building a park there—behind there a little park."

Plaintiff, Marleen Majovski, who was 12 years of age at the time of the trial and in the seventh grade

at school, testified that she had known Poppoff for six or seven years prior to his death; that Poppoff, when he was at the hotel and before he bought the tract of land on Division Street, would visit them two or three times a week; that when he was in camp "we went there every week end * * * we went about every Sunday. We went every Sunday, in fact" in the summertime. We now quote from her testimony:

"Q. * * * Well, now, did Mr. Poppoff ever ask you to do anything for him in any way? A. Yes, he did.

"Q. Did he ever say anything about the property, what he was going to do with that after he bought it? A. Oh, yes, he said almost every time we went there that he wanted to give the place to us.

"Q. Did he tell you anything about how he was going to give it to you or anything? A. Well, he didn't then at that time but about the summer before he said, he told us that he had made a will for us.

"Q. Well, did he say anything about—what did he say about making the will? Did he ask you— Was anything said about doing anything or what about it? A. He said that if we helped him and do anything he wanted us to do that we would get the property.

"Q. How would he fix it; what would he do about it? A. He said that he would make a will.

"Q. Was that all in the same conversation, same time there. A. No, it wasn't. About the will it was the summer before he died. We were taking a little walk. That is when he told us that he had made the will, but before then he told us that he would give us the property and if we did anything he wanted us to do.

"Q. Now, did you tell him you would or wouldn't, or what did you tell him? A. I told him him I would do anything he wanted me to do.

"Q. Did you do all the things that he asked you to do after that. A. Yes.

"Q. Did Carl do anything for him? A. Yes. He helped him—whatever he wanted him to do.

"Q. Was Carl along at the time that he proposed that he would give you this if you did the things he wanted? A. Yes.

"Q. And where do you say that happened? A. We were taking a little walk around his place over there and that is—We started talking about it then and he told us about the will."

Marleen testified that when she and her brother would go to Poppoff's place they would take a few things like buns, cakes and pies that her mother had made, and that her father and mother would come out to the place in the evening and "bring lots of things that we would eat there"; that Poppoff hurt his arm and later hurt his leg; that when he hurt his arm they "went with him to town and he called us over to help him carry" things he had bought; and that after he hurt his arm he wanted her to "warm up some hot water for him to soak" his arm in, which she did. She testified that they went over to Poppoff's place about three times a week "while he was laid up" and about two times a week "when he didn't send for" them; that every Christmas for a number of years before he died Poppoff took her and Carl to town to buy them Christmas presents, and that the Christmas before he died he took them to the bank, procured his safety deposit box, "and he laid the box on a table and took out some bonds, quite a few of them there— I don't know exactly how many—and he showed it to us and he said, 'These are your bonds,' and he put

them back in the box and then took out a piece of paper and he said, 'This is a piece of paper for the place that I am going to give to you.' "

In answer to the question as to what services she and Carl had performed for Poppoff, besides helping him while he was sick, Marleen said:

"Well, we—during the summer we pulled Johnson grass for him and there was quite a few berries to be picked, and almost every time we went there in berry season he told us to pick them and clean them and I did that. And while I was doing that he was fixing his little chicken coop, I guess, there and Carl was helping him there. And then I— after we cleaned them, I washed them out and everything and then I set the table and after I did that, we were waiting for my mother and father to come. So later I went on to where they were and was just watching them what they were doing and then I did everything about that he told me to do and what we needed to do at that moment."

Marleen testified that she picked up stones while he was digging, and that when they were there they liked to feed the chickens and rabbits, which Poppoff told them to feed. She said that she and Carl went to the store for Mr. Poppoff, a distance of one or two city blocks from his place. She stated that she and her brother would sometime go by themselves on the bus to Mr. Poppoff's place; that they liked to go there because it was a nice place to play; that it was "lots of fun" feeding the rabbits and picking berries; that at times they took some of the berries home; and that Mr. Poppoff gave them "lots of presents" for Christmas. Concerning the alleged agreement she testified as follows:

"Q. Do you remember the day or the date when Mr. Poppoff made any promise to you that he

would give you this house—you and your brother this house? A. No, I don't remember the day. He told us many many times that he would give us the place.

"Q. Well, do you remember the reason why he told you that? A. Yes. He—because he liked us very well and he said that we did anything he wanted us to and we behaved very well over there and he liked us better than anybody he ever knew.

"Q. That is right. And he wanted you and your brother to be nice children? A. Yes.

"Q. And he would make you—tell you to be nice and if you were nice, he would give you this place? A. Yes."

Mrs. Robert Majovski confirmed what her husband had said about the friendly relationship existing between the Majovski family and Poppoff. She was born in Macedonia. She stated that Poppoff frequently said, "what he has got everything was going to go to the children", and that he has "got it everything fixed up in black and white where the children will never have any hard time of getting the place". She testified that Poppoff said: "I think a lot of them [Marleen and Carl] and I want them to remember me." She stated that Poppoff said he had a sister who had children but "he didn't really care very much for" his sister.

Steve Slavoff, one of the executors, testified that he had known decedent for a long time. He said that Poppoff told him that he was improving the farm for the Majovski children, and that he had talked about making a will while he was working in the lumber camp. He said that Poppoff told him, "I have one sister and I can't get along with her. She beats me out of my father's property." Slavoff further testi-

fied that Poppoff did not say anything about an agreement that he had with the plaintiffs about taking care of him but that he did say that "after I die, I leave that to the Majovski children"; and that "They are the kind of children I like."

Elizabeth C. Hicks, who was a neighbor of Poppoff, testified that she had seen the Majovski children around the Poppoff place frequently and that Poppoff said he was leaving his property to them. She stated that Poppoff "said that he liked them so much, that was the expression he used; he said they were such good children, so well-disciplined and they were the type of children that he liked and he wanted them to have what he had and he had it fixed for them. Now, that was a term he used. He didn't testify it was a will." She further testified that Poppoff said that he had only one sister "and I just hate her. I have no use for her whatever. She took all the money that I sent over to the old country to take care of my father and then when he died she sends me a bill."

Louis M. Hicks, who was a neighbor of decedent, testified that Poppoff told him that he had made a will, and then remarked, "I make that will and be cremated and all of my property go to the Majovski children. * * * Well, I have got mine fixed so that my sister wouldn't get it. * * * I want everything I have got to go to these children." He further testified: "Q. Now, did he say why he was leaving it to the children? A. Oh, he liked them very much and the expression he used was 'I like them too much'. Q. Did he say anything about their doing anything for him? A. No. Not exactly that I remember. * * *"

At the time of his death there were bonds in Poppoff's safety deposit box of the value of $1091.

Bonds of the value of $485.50 were payable to Marleen, and the remainder of the bonds, valued at $605.50, were payable to Carl. The will left by Poppoff was dated November 2, 1940. He devised and bequeathed "to my beloved sister, Gitsa Evanov Slavchova," all of his property.

The document which the decedent signed on February 26, 1946, a paragraph of which has heretofore been quoted in reference to the complaint, was not witnessed. In it Poppoff stated that in case of his death he willed the tract of land to plaintiffs, and that the remainder of his estate was to be given to his close relatives, if living. What assets that Poppoff had, besides the tract of land and these bonds, are not disclosed by the record.

■■ Oral contracts to devise or bequeath property, in consideration of personal services to be performed by the promisee, are within the statute of frauds. They have, in many instances, been judicially recognized and enforced in Oregon, where the law relative thereto is well settled. We refer to only a few of the latest decisions, which, in our opinion, are controlling here: *Tiggelbeck v. Russell,* 187 Or. 554, 213 P. (2d) 156; *Perez v. Potier,* 179 Or. 123, 170 P. (2d) 343; *Benson v. Williams,* 174 Or. 404, 143 P. (2d) 477, 149 P. (2d) 549; *Hunter v. Allen,* 174 Or. 261, 147 P. (2d) 213, 148 P. (2d) 936; *Harris v. Craven,* 162 Or. 1, 91 P. (2d) 302; *Losey v. O'Hair,* 160 Or. 63, 83 P. (2d) 493; *Magness v. Magness,* 148 Or. 44, 33 P. (2d) 1005; *Lewis v. Siegman,* 135 Or. 660, 296 P. 51, 297 P. 1118. The remedy of specific performance of such contracts is not available as a matter of absolute right but as a result of the exercise of sound judicial discretion. Because of the death of Poppoff, one of the parties

to the alleged contract, and the unavailability of his version of the transaction, it is of the utmost importance that the evidence in behalf of the plaintiffs be carefully scrutinized.

■ Before a contract, of the nature of the one here involved, will be enforced it must be established by clear and satisfactory evidence. The agreement must be clear, just, definite, reasonable, and mutual in its obligations and there must be a strict performance by the promisee of all the terms and conditions of the contract. In the instant case it is alleged that Poppoff, "in consideration of the many services which plaintiffs *and their parents* had rendered and the many tasks which plaintiffs *and their parents* had performed for him and on account of the love and esteem" of said decedent for plaintiffs and their parents "and the further consideration that plaintiffs *and their parents* would perform such services" for decedent as he might request from them during his lifetime, "promised and agreed to will and devise to plaintiffs all of the real property hereinbefore described." (Emphasis supplied.)

There is no evidence whatsoever that the purported agreement was in consideration of any services which plaintiffs or their parents had previously rendered to the decedent; nor is there any evidence that the consideration for said purported agreement was based upon any services which were to be performed by plaintiffs' parents in the future. According to Marleen's testimony, Poppoff said to them "that if we [Marleen and Carl] helped him and do anything he wanted us to do that we would get the property", and that she told him that she "would do anything he wanted me to do". She testified that both she

and Carl had done everything that he had asked them to do. The agreement alleged in the complaint has not been established. The one which Marleen referred to in her testimony is very vague and indefinite, and, because of its indefiniteness, it is impossible to determine whether it has been performed.

It is apparent from the record that the decedent intended to give this tract of land to the Majovski children because of his love for them and not because of the performance by them of any alleged contract. The father of these children testified that Poppoff told him, when they were looking for property for Poppoff to purchase, that the property "I am going to buy I am going to give that to your children after my death". Other witnesses also testified that Poppoff said that he was going to give the property to the children because he liked them and that Poppoff did not refer to any purported agreement or understanding between him and the children as to services to be performed by them.

■ The court, in *Losey v. O'Hair*, supra, after referring to the foregoing requisites of an enforcible contract of the kind here under consideration, said:

"In addition to the above requirements, it must also appear, when the conveyance is promised in consideration of the performance of services by the grantee or devisee, that the rendition of such services is 'wholly referable to the contract to convey and solely predicated upon that agreement, and that proper and adequate compensation for the services can not otherwise be made', and that 'such services must be of exceptional character or of such a peculiar value to the promisee that the value thereof is not subject to pecuniary estimate' ". (Citing several authorities.)

■ We are of the opinion that the things which plaintiffs did for Poppoff were not referable to any contract. What was done by these children was nothing more than, or different from, that which many other children would have done under similar circumstances where no purported contract existed. Poppoff and the Majovski family had been intimate friends for a number of years. Long before Poppoff mentioned leaving his property to plaintiffs he had expressed his personal interest in them. He gave them the bonds, which we have previously referred to, but failed and neglected to make out a proper will devising this tract of land to them. The evidence falls far short of meeting the requirements, heretofore outlined, of an enforcible contract to devise real property.

Whether the ages of Marleen and Carl, to wit, seven and five respectively, at the time of the purported contract, were such as to have prevented the consummation of the alleged contract, has not been discussed by the litigants and we here express no opinion concerning that matter.

The decree appealed from is reversed and the suit dismissed. Costs will not be allowed to either party in this court.